## COUNTY OF TIPTON *v.* LOCOMOTIVE WORKS.

1. A general statute of Tennessee required the county courts, when thereunto authorized by a popular vote at an election held for the purpose, to subscribe for stock in a railroad company.  A special statute was subsequently passed, which, without requiring the submission of the question of subscription to a popular vote, conferred power on the county courts of the counties on the line of a particular railroad to make, and on the company to receive, a subscription for its stock.  *Held*, that the special statute is not in violation of the provisions of sect. 8, art. 1, or of sect. 7, art. 11, of the Constitution of Tennessee of 1834, *infra*, p. 525.

2. A county, having lawful authority, issued its bonds in payment of its subscription to a railroad company.  Between the latter and another company a consolidation was about to take place, upon condition that the county court would, on an extension of time being granted, levy and collect a tax sufficient to pay the amount due on the bonds.  The county court accepted the proposition, and gave the requisite assurance.  The consolidation thereupon took place.  *Held*, that the county was estopped from denying the validity of the bonds in the hands of a *bona fide* holder, to whom they were transferred for value by the consolidated company.

ERROR to the Circuit Court of the United States for the Western District of Tennessee.

The facts are stated in the opinion of the court.

*Mr. George Gantt* for the plaintiff in error.

*Mr. William Y. C. Humes*, *Mr. Henry T. Ellett*, and *Mr. Stanley Matthews* for the defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This is a writ of error from a judgment in favor of the Rogers Locomotive and Machine Works against the county of

Tipton, in the State of Tennessee, for the principal and interest of fifty bonds of $500 each, dated Jan. 1, 1869, and payable on the first day of January, 1873, to the Mississippi River Railroad Company or bearer, with interest from date at the rate of six per cent per annum.

Each bond, signed by the chairman of the Tipton County court, and countersigned by its clerk, recites that it is " issued under and by virtue of sect. 6 of an act of the legislature of the State of Tennessee, passed Feb. 25, 1867, amended on the twelfth day of February, 1869; " also, that " a special tax is levied, by authority of law, upon all the taxable property in the county of Tipton, to meet the principal and interest of these bonds, collectible in equal instalments, running through five years, as the bonds themselves mature;" and further, that "this is one of four hundred bonds, all of the same denomination and rate of interest, issued by Tipton County in payment of a subscription of $200,000 to the Mississippi River Railroad Company, made by the county court of said county, under the authority of the acts above recited, — these bonds, transferable by delivery and redeemable in five years at the rate of $40,000 a year, commencing Jan. 1, 1870."

When the foregoing acts were passed there was in force a general statute, under the provisions of which counties, incorporated cities, and towns could subscribe stock in railroads, upon certain terms and conditions, one of which was the previous approval of the legal voters of such county, city, or town, at an election called and held for the ascertainment of their will. These special acts, in connection with the act of Nov. 5, 1867, for the benefit of the Mississippi River Railroad Company, authorized the county courts of counties *on the line of that company's road* (among which was the county of Tipton) to subscribe to its capital stock, without requiring a submission of the question of subscription to a popular vote, — the majority of the justices in commission being present, and a majority of those present concurring.

The validity of those acts is questioned here, as it was in the court below, upon the ground that they are unconstitutional, and, therefore, gave no authority to make the subscription, or issue bonds in payment thereof.

The provisions of the Constitution of Tennessee (that of 1834), to which, it is supposed, they are repugnant, are sect. 8 of art. 1, and sect. 7 of art. 11; the first of which declares that "no freeman shall be taken, or imprisoned, or disseised of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life or property, except by the judgment of his peers, or the law of the land;" and the last of which provides that "the legislature shall have no power to suspend any general law for the benefit of any particular individual; nor to pass any law for the benefit of individuals, inconsistent with the general law of the land; nor to pass any law granting to any individual, or individuals, rights, privileges, immunities, or exemptions, other than such as may be, by the same law, extended to any member of the community who may be able to bring himself within the provisions of such law: *Provided, always,* the legislature shall have power to grant such charters of incorporation as may be deemed expedient for the public good."

It is contended that these special acts are in violation of sect. 7, art. 11, of the State Constitution in that they authorized a limited number of counties to subscribe to the capital stock of a particular railroad corporation, and also because they dispensed with the previous sanction of a popular vote, as required by the general statute regulating railroad subscriptions by counties, incorporated cities, and towns; and, further, that being partial and special laws, inconsistent with the general law upon the subject of municipal subscriptions, they do not constitute "the law of the land," within the meaning of sect. 8, art. 1, of that Constitution. The argument in behalf of the plaintiff in error is, that the power, reserved to the legislature in the proviso to sect. 7 of art. 11, "to grant such charters of incorporation as may be deemed expedient for the public good," is limited, in its exercise, by the prohibitions contained in the body of the same section; and that a charter conferring upon a particular railroad company, or upon particular municipal corporations, special privileges and immunities, not given by the general law, was inconsistent with those prohibitions, and, besides, was not a "law of the land" within the meaning of sect. 8 of art. 1.

These propositions have received at our hands that consideration which their importance confessedly demands; and if we err in the conclusions reached, it will not be the fault of able counsel, who, both in oral and printed arguments, have pressed upon our attention every suggestion which seems to have any bearing upon the question presented for determination.

The earnestness with which they have asserted their positions to be sustained by adjudications of the Supreme Court of the State has made it necessary for us to examine, with great care, a very large number of the reported decisions of that learned tribunal. If, when the acts in question were passed, the General Assembly was without power, under the Constitution, as interpreted by the highest court of Tennessee, to enact a special law authorizing a designated number of counties, without a previous vote of the people, to make subscriptions of stock to a particular railroad running through such counties, our duty is to accept that construction of the fundamental law of the State. But if there was no such contemporaneous or fixed construction, this court, as was the court of original jurisdiction, is under a duty imposed by the Constitution of the United States, from the performance of which it is not at liberty to shrink, to determine, for itself, what were the legal rights of parties at the time the bonds in suit were issued.

It would extend this opinion to an improper length should we extract from the numerous decisions of the State court, cited by counsel, so much of their language as seems pertinent to the questions before us. We must, therefore, content ourselves with stating only the general doctrines to be deduced from the adjudged cases, some of which are cited in a note to this opinion.[1]

Prior to the case of *Wallace* v. *Tipton County* (to which we

---

[1] *Budd* v. *The State*, 3 Hum. 483; *Vanzant* v. *Waddel*, 2 Yerg. 260; *State Bank* v. *Cooper*, id. 599; *Tate* v. *Bell*, 4 id. 202; *Officer* v. *Young*, 5 id. 320; *Fisher* v. *Dabbs*, 6 id. 119; *Jones* v. *Perry*, 10 id. 59, 78; *Marr* v. *Enloe*, 1 id. 452; *Sheppard* v. *Johnson*, 2 Hum. 285; *Hazen* v. *Union Bank of Tennessee*, 1 Sneed, 115, 118; *Nichol* v. *Mayor, &c.*, 9 Hum. 252; *City of Memphis* v. *The Memphis Water Co.*, 5 Heisk. 495; *Memphis City Railroad Co.* v. *Mayor & Aldermen of Memphis*, 4 Cold. 406; *L. & N. Railroad Co.* v. *County Court of Davidson*, 1 Sneed, 638; *McCallie* v. *Mayor, &c.*, 3 Head, 317. See also numerous cases cited in the head-notes of the foregoing cases as they appear in Chancellor Cooper's Tennessee Reports.

will hereafter refer more particularly), the following rules or principles seem to have been established by repeated adjudications in the Supreme Court of the State, viz. : —.

That a law, which did not alike embrace and equally affect all persons in general, or all persons who exist, or may come into the like state and circumstances, was a partial and special law, and, therefore, not " the law of the land," within the meaning of the Constitution of 1796, from which was taken sect. 8 of art. 1 of the Constitution of 1834 ;

That sect. 7 of art. 11, prohibiting the suspension of a general law for the benefit of any particular individual, or the passage of any law for the benefit of individuals, inconsistent with the general laws of the land, or the passage of any law granting to any individual or individuals, rights, privileges, immunities, or exceptions, other than such as may by the same law be extended to any member of the community who may be able to bring himself within the provisions of such law, is a statement, in condensed form, of the construction which the Supreme Court of the State had in several decisions placed upon the phrase, " the law of the land," as used in both the Constitutions of 1796 and of 1834 ;

That, nevertheless, the authority of the legislature to create corporations with special rights and privileges, existed as an incident of sovereignty ; that a law creating a corporation and granting a franchise was more in the nature of a contract than a "law of the land," in the sense of the Constitution ; and, upon that ground, the right given to a bank by its charter, granted in 1832, to take a greater rate of interest than was allowed by a general statute to individual citizens, was held not to be obnoxious to the Constitution upon the ground that it was not a general law, or " the law of the land ; "

That the proviso in sect. 7 of art. 11 of the Constitution of 1834 was inserted " for the purpose of enabling the legislature thereby to grant exclusive privileges, which, but for the proviso, would be prohibited by the body of the section ; " that the power to create corporations was not curtailed or restricted by the general prohibitions in that section, but only by the positive provisions to be found in other parts of the Constitution ;

That prior to the adoption of the Constitution of 1834 the Supreme Court of the State suggested doubts as to whether the taxing power, being legislative in its nature, could be constitutionally conferred upon the subordinate municipal corporations or civil divisions of the State; and, that for the purpose of removing those doubts, the convention which framed that Constitution incorporated into it sect. 29 of art. 2, which declares that "the General Assembly shall have power to authorize the *several* counties and incorporated towns in the State to impose taxes for county and corporation purposes, respectively, in such manner as shall be prescribed by law; and all property shall be taxed according to its value, upon the principles established in regard to State taxation;"

That the construction of a railroad to or through a county or incorporated town is, in the one case, a county, and in the other a corporate purpose, for which the legislature may invest such county or town respectively with the power to impose taxes;

That under sect. 29 of art. 2 the legislature could, by special act, confer upon the mayor and aldermen of an incorporated town, directly and exclusively (and, consequently, upon the county court of a county), the power to subscribe railroad stock, without first, or at all, submitting the question of subscription to a vote of the inhabitants of such town.

Such were, beyond question, as we think, the established principles of the Constitution as announced by the highest judicial tribunal of the State, up to the decision in *Wallace* v. *Tipton County*, to which reference has already been made. These doctrines, it must be conceded, would sustain the statutes of 1867 and 1869 against the objections urged. But it is contended that the decision in that case is a direct authority against the constitutionality of those acts, and should control our judgment.

That case deserves special examination. It was a suit commenced in 1873, in an inferior State court of Tennessee, by certain taxpayers of Tipton County against the county court of that county, the Paducah and Memphis Railroad Company (a corporation lawfully created by the consolidation, in 1872, of the Mississippi River Railroad Company, with the Paducah

and Gulf Railroad Company, a Kentucky corporation), and the local collectors of Tipton County engaged in the collection of taxes which had been levied to meet the bonds constituting the issue of $200,000 to the Mississippi River Railroad Company, under the aforesaid acts of 1867 and 1869. The object of that suit was to enjoin the collection of such taxes, upon the ground that those acts were unconstitutional and void. In May, 1874, certain citizens of other States, holders of a portion of the Tipton County bonds, were, upon their own application, made parties defendant in that suit. They thereupon filed a petition for its removal to the Circuit Court of the United States, and, as to them, the opinion of the court states, the suit was removed. The railroad company, by an amended answer, disclaimed all interest in the suit, and informed the court that it neither held nor owned any of the bonds, but that they were held and owned by others who had paid value therefor. Thenceforward it was a suit, practically if not exclusively, between parties who had no interest in enforcing the collection of the county's bonds. It was finally determined without the presence of any of the holders of the bonds. Waiving any question as to whether, under the act of Congress, the whole suit was not removed to the Federal court, it is sufficient to say that, in accordance with the prayer of the taxpayers, a decree was entered, which was, by the Supreme Court of the State, in all respects, affirmed. Although the case was determined in the Supreme Court, at its September Term, 1875, it has not, that we can ascertain, been published in its reported decisions, and we are not, therefore, advised of the precise grounds upon which the acts of 1867 and 1869 were assailed in argument, as being in conflict with the Constitution. But the opinion of the court discloses the fact that those acts were held to be repugnant to sect. 8 of art. 1, and sect. 7 of art. 11, of the State Constitution, upon the ground, that while the general law of 1852, regulating railroad subscriptions by counties, towns, and cities, required a popular vote as a condition precedent to any authority to make subscriptions, the special acts of 1867 and 1869 permitted a few counties, upon the line of the Mississippi River railroad, by their respective county courts, and without a submission of the question to the people, to subscribe to that

company's stock. No comment whatever is made in the original opinion, and very little in the opinion on the rehearing, upon the scope or effect of the proviso in sect. 7 of art. 11, giving or reserving to the legislature the power to grant such charters of incorporation as it deemed expedient for the public good. But it is to be assumed that the court did not regard that proviso as materially affecting the conclusion reached. If there had been no decision of the State court, subsequent to that of *Wallace* v. *Tipton County*, on the subject of municipal subscriptions, under special statutes, we should feel greatly embarrassed by the circumstance, that the judgment of the Circuit Court could not, upon this branch of the case, be sustained, except by disregarding that decision.

But all difficulty, we think, is removed by the decision of the State court in the more recent case of the *Knoxville and Ohio Railroad Company* v. *Hicks*, determined in 1877. Unless we mistake, altogether, the import of that decision, it is inconsistent with the doctrines of *Wallace* v. *Tipton County*, and, upon the point now before us, practically overrules the latter case.

In *Knoxville and Ohio Railroad Company* v. *Hicks*, it was a question whether an act passed in 1852, exempting the capital stock, dividends, roads, and fixtures of the Knoxville and Kentucky Railroad Company from taxation, until the stock paid a dividend equal to the legal rate of interest, was in conflict with the Constitution of 1834. That Constitution declared (sect. 28, art. 2) "that all lands, liable to taxation, held by deed, grant, or entry, town lots, bank stock, &c., and such other property as the legislature may from time to time deem expedient, shall be taxable." In view of that constitutional injunction, the case was a very strong one for the application of the prohibitions, against special and partial laws, contained in sect. 7 of art. 11, if such prohibitions had any application whatever to charters of incorporation granted by the legislature. But the court, after stating that the convention of 1834 comprised among its delegates some of the ablest lawyers the State ever had, who were familiar with the principles of the Dartmouth College case, and knew that the legislature, under the previous Consti-

tution, had, without question, exercised the power of granting charters, with total or partial exemptions, said: " With these facts prominently before the convention, if it was their purpose to restrict the power of the legislature, one should expect to find such restriction expressed in unequivocal language. But the only direct provision, in regard to the power of the legislature in respect to charters of incorporation, is in the proviso to sect. 7 of art. 11, to the effect that the restriction upon the power of the legislature to grant special privileges, immunities, and exemptions was not to be construed to affect the power of the legislature to grant such charters of incorporation as they might deem expedient for the public good, thereby leaving the power as it previously existed. See *Hope* v. *Deaderick*, 8 Hum. 1. If it had been the purpose of the convention to restrict the power of the legislature in this particular, this would certainly have been the appropriate place to insert the restriction ; but so far from doing so, we find only the proviso above referred to, which was intended to exclude the idea that the first clause of the section against the granting of special privileges, immunities, or exemptions was intended to limit the power of the legislature in regard to granting charters of incorporation. From this, the conclusion seems necessarily to follow, that the legislature was still left the power to pass laws creating bodies corporate, with all the rights, privileges, immunities, and exemptions which it was usual to vest in such fictitious persons under the general principles previously recognized ; and, as we have seen, the power in question was previously recognized by the general law and the authorities of the State. We do not say rights, privileges, or immunities might be granted inconsistent with other positive restrictions of the Constitution." The court then proceeds to consider the language of sect. 28 of art. 2, already cited, in reference to taxation, and says : " On the other hand, this section may well be construed as having no reference to the property of corporations to be created, and as leaving the power of the legislature, in this regard, as it stood before. This is the more natural construction when we take this section in connection with the clause before referred to, and find that no express restriction is placed upon the power conceded to have previously existed in the legislature, in re-

spect to corporations, in that clause which refers directly to the power to grant such charters."

The chief significance of the decision in the last case lies in the explicit declaration by the court, that the power expressly granted to the legislature in the proviso to the seventh section of article eleven, to create corporations with such charters as, in its judgment, were expedient for the public good, was not limited or restrained in its operation by the prohibitions in the same section against special rights, privileges, immunities, or exemptions; in other words, that the legislature, as to corporations, could grant special rights and privileges which, but for the proviso, might be deemed obnoxious to the prohibitory clauses of that section. And in that view we concur.

The case of *McKinney* v. *Overton Hotel Co.* (12 Heisk. (Tenn.) 104), cited by counsel for plaintiff in error, is not adverse to this conclusion. The main question there was as to the constitutionality of an act, passed in 1860, authorizing the hotel company to issue mortgage bonds bearing a greater rate of interest than was allowed by the general law of the State. It was held that sect. 7 of art. 11, giving power to grant such charters of incorporation as the legislature deemed expedient for the public good, must be construed in connection with sect. 6 of the same article, which imposed upon the legislature the duty of fixing the rate of interest, and declared, that the "rate so established shall be equal and uniform throughout the State." The decision was that the legislature, in creating corporations under sect. 7, could not grant to them "powers or rights expressly forbidden by any other clause of the Constitution." Consequently, the rate of interest fixed by the legislature was applicable to corporations as well as to individuals. The language of the court, in connection with prior decisions, upon the general subject of corporations, justifies the conclusion that the act of 1860 would not have been declared void had not the Constitution of 1834 expressly required the rate of interest to be equal and uniform throughout the State.

Looking, then, as well at the language of the Constitution as at the course of decision in the Supreme Court of Tennessee up to the time the acts of 1867 and 1869 were passed, and giving full effect to its latest utterance, to which our attention

has been called, and remembering, also, that the power given to a municipal corporation to subscribe to the stock of a railroad company may be, also, a right and privilege of that company (*County of Scotland* v. *Thomas,* 94 U. S. 682; *Wilson* v. *Salamanca,* 99 id. 499; *Empire* v. *Darlington,* 101 id. 87, 91), our conclusion is, that those acts were not repugnant to the constitutions of the State, by reason of the authority they confer on a limited number of counties to make, and on a particular railroad corporation to receive, a subscription of stock, nor because they dispensed with the previous assent of the people of such counties expressed at a popular election.

It remains to inquire whether, in view of the evidence, the Circuit Court committed any error of law, either in giving or refusing instructions to the jury.

Certain facts should be stated as explanatory of the instructions which were given to the jury.  Upon the trial evidence was introduced in behalf of the county tending to establish " fraud, moral coercion, intimidation, and bribery in the procurement and issuance of the bonds in suit in this case upon the part of the Mississippi River Railway Company," and that such corrupt practices were not known to the county court until February, 1875.  On the 30th of September, 1871, at a meeting of the board of directors of the railroad company, a resolution was offered by one who, at the time, was a justice of the peace of Tipton County, which, after reciting the failure of the county to provide means for the payment of its bonds and coupons, designated E. Norton, as agent of the company, to make the following proposition to the county, namely : " That this company will grant an extension of time for the payment of said bonds and interest, so that the said payments shall be extended to the period of ten years from the date of the bonds, in ten annual instalments, instead of the time they now have to run; this extension to apply to all bonds which this company owns or controls.  But this proposition should be made on condition that the County Court of Tipton County shall immediately levy a tax, and proceed to its collection, for the amount now due under this offer, and that they shall each year levy, collect, and promptly pay over the amount to fall due each year, as the same falls due during the whole period

of this proposed extension; and, in case of a failure to levy, collect, or promptly pay over said annual amount, then the remaining bonds to become due, according to their original terms."

This proposition was presented to the county court by Norton at its October Term, 1871. Several of the justices were then present who had attended the July meeting of 1870, on which latter occasion the court, by resolutions, entered upon its records, declared that the bonds had been issued without lawful authority, and were not binding upon the county. Across the record of those resolutions was, however, subsequently written the word "*void*," but by whom, or when, so written, does not appear.

In addition to this evidence, the substantial facts upon which the case went to the jury are indicated in the following charge given by the court at the request of the plaintiffs: —

" That if you credit the testimony, and from it believe that Mr. Norton, as president of the Paducah and Gulf Railroad Company, in October, 1871, appeared before a duly organized county court of Tipton County, and in open court fully explained to it that a consolidation was contemplated between his company and the Mississippi River Railroad Company, and that such consolidation depended upon the fact whether the bonds in controversy were to be paid by the county, and whether it would proceed to levy a tax for the same, and then and there presented the proposition of the said Mississippi company recited in the resolution of that date, passed by the said county court, and that said Paducah company was then solvent, and owned and operated a railroad from the town of Paducah, in Kentucky, to Troy, in Tennessee, and that no portion of the railroad in Tipton County was then completed, and that but a few thousand dollars had been expended in work thereon, and that the purpose of said consolidation was to complete said road in Tipton County, and to connect it with the line of said Paducah and Gulf road, and that said road has since been completed to the town of Covington, in said county, to the city of Memphis, being a distance of thirty-seven miles, twenty-one whereof are in said Tipton County, and that said Norton communicated to his company the action of said county court at its said Octo-

ber session of 1871, and that in consequence thereof, and in reliance· thereupon, said consolidation took place, whereby said Paducah and Memphis railroad was created, and that said latter company thereafter completed the road from Covington to Memphis, and has regularly run and operated the same from the 25th of June, 1873, to this date, and that the plaintiffs in this action, in the ordinary course of ·trade, and without any notice of ill faith in the procuration of said bonds, gave full value therefor to the said Paducah and Memphis Railroad Company, by furnishing engines to be employed on said road, and that said Paducah and Memphis Railroad Company received said bonds without any notice whatsoever of any fraud in their issuance; then the fact that one or more of the justices of said county court, who originally voted for said subscription of stock, were induced so to do by corrupt means, and all other proofs or matters of fraud, constitute no defence to this action."

To the giving of that charge the county, by its attorney, excepted.

At the request of the county the court charged the jury that "if the railway procured the issuance of the bonds by bribery, fraud, and corruption, that they would be void in the hands of the railway company, just as if they had not been issued; that all persons taking them from the company with notice, or under circumstances to put the vendor on inquiry, would stand in no better plight than the railway company would;" and that "if it appears that there was actual fraud in procuring the bonds, then the plaintiffs would be bound to show that they were *bona fide* holders."

The defendant requested the court to further charge the jury as follows: "That if the plaintiff took them (the bonds) after due, they would stand like the railway company's;" which request was granted, with the modification that "unless the jury believed as stated in the charge given at the request of the plaintiffs:"

"That a party may waive the fraud by subsequent acts, but in order to make this doctrine apply, it must appear that the party waiving was fully apprised of the fraud which he waives. He must know of the fraud, and, knowing, waive it;" which was given with this modification: "Although this is generally

true, it has no application to this case if the jury believe as in the charge stated in favor of the plaintiffs. If one citizen about to buy a demand against another applies to him in good faith to ascertain whether the demand will be paid, and is informed that it will be, and buys in reliance upon such information, the party admitting his obligation will not be permitted to defend, although the admission was made in ignorance of a valid defence."

" That if before a contract which was void, which is no contract, had become a subsisting and valid contract, a constitutional provision intervenes, which took away all power from one of the contracting parties to enter into the contract, then there could be no contract by ratification, because the party would be under disability of contracting either expressly or by ratification. Therefore, if the contract was void in its making, for fraud, and the facts of the fraud were not known, and known waived, before May, 1870, when the new constitution was adopted, then there could be no contract by ratification or otherwise, as all power to make such a contract as this was then, by the mandate of the Constitution, taken away from the county court." That instruction was also granted, with this modification: " That although the general reasoning of this request is correct in legal principle, still, if the jury believe as stated in the charge for the plaintiffs, the defendant will be estopped to set up fraud as a defence, after having induced their purchase by answering to an inquiry of whether they would be paid, that they would be. And if the jury believe that such were the facts in this case, then fraud will not constitute a defence."

" That if the influences which procured the contract were afterwards successfully exerted in concealing the fraud and defeating its discovery and efforts to resist the contract, then there can be no such thing as a waiver; that communities may waive fraud, but more indulgence is extended to them than to individuals; that accepting the road and using it, and paying a part of the consideration in ignorance of the fraud by which a vote was produced, will not be a waiver." This request was given with the same modifications, however, as made in reference to the last two preceding requests by the defendant.

We are unable to perceive that any error of law was committed to the prejudice of the county. The case went to the jury under circumstances quite as favorable to it as the evidence justified. If the facts disclosed in the instructions were believed by the jury to be established by the testimony, its duty was to return a verdict for the plaintiffs. The charge of fraud, bribery, moral coercion, and intimidation applied, it must be observed, to the Mississippi Railroad Company and to the justices composing the county court at the time the original subscription was made, and the bonds issued and delivered. When the court, subsequently, received the written proposition from the railroad company, for an extension of time upon certain conditions, it was distinctly informed that its action would affect and control large business operations in which others were concerned who had no connection with the original subscription, or with the issue of the bonds. The extension of time was accepted upon the terms and conditions set out in the proposition of the company, and without, so far as the record discloses, any dissent among the twenty-two justices present; and, as evidence of its purpose to adhere to the new agreement and provide for the payment of the bonds and coupons, the county court ordered the levy of a tax upon all of the taxable property of the county. We have already seen that at the meeting of the county court held in July, 1870, resolutions were entered of record declaring that the bonds had been issued without lawful authority, and directing such steps to be taken as were necessary to protect the people against the proposed burden. With this record before the justices who composed the court in October, 1871, the proposition for an extension of time was accepted, and an assurance of record was thereby given, that the county would meet the bonds according to the new terms. The force of this action of the court was increased in view of sect. 402 of the Code of Tennessee, adopted in 1858, declaring that "every county is a corporation, and the justices in the court assembled are the representatives of the county and authorized to act for it."

Whether upon the faith of these proceedings in the county court the Paducah and Gulf Railroad Company consolidated with the Mississippi River Railroad Company, was fairly sub-

mitted for the determination of the jury. The new company having become, in virtue of that consolidation, the owner of the assets of the constituent companies, including the bonds in suit, proceeded with the work of construction. There was evidence tending to show that at the time of the consolidation only a few thousand dollars had been expended in building the Mississippi River railroad in Tipton County; that after the consolidation about half a million of dollars had been expended in Tipton County by the Paducah and Memphis Railroad Company; that the road from Memphis to Covington, the county seat of Tipton, a distance of thirty-seven miles (of which twenty-one miles were in Tipton County), had been built and equipped, and trains running thereon regularly, ever since June 25, 1873; that the road had been graded, bridged, and made ready for the cross-ties and rails from Covington to one and a quarter miles north of Ripley, in Lauderdale County; that since the consolidation the road had been completed and equipped from Troy to Trumber, a distance of fifteen miles, and trains run regularly between those places; that the road had been graded, bridged, and cross-tied for the rails from Trumber to Dyersburg, and the right of way secured on about twenty-one miles of the road between Dyersburg and Ripley. This is not all. The stock which Tipton County originally received in payment of its subscription was voted by its official representative in favor of the consolidation, and the county received, in place of its stock in the Mississippi River Railroad Company, stock for like amount in the new company. Besides, the county voted the new stock in favor of the execution of a mortgage for $1,951,000, which was placed upon the property of the company which was formed by the consolidation.

The acceptance by the county court of the terms and conditions set forth in the proposition of Sept. 30, 1871, and its participation, under the circumstances adverted to, by its authorized representatives, in the proceedings which resulted in the consolidation, whereby the situation of the Paducah and Gulf Railroad Company became materially altered, was, in effect, a representation to those interested in that company that the county would not withhold payment of its bonds or coupons, but would meet them according to the terms of the new agree-

ment.   By its conduct it induced those interested in the Paducah and Gulf Railroad Company — then solvent, out of debt, and owning and operating a complete railroad from Paducah, Ky., to Troy, Tenn., worth $1,000,000 — to believe that the bonds would constitute a part of the available assets of the new company.   The defendants in error received a portion of these bonds as early as March 15, 1873.   The integrity of the business transaction by which they acquired them is not questioned by any evidence recited in the record.   Nor does it appear that any evidence was offered that impugned in any degree the good faith, in respect of these matters, of those who controlled the Paducah and Gulf Railroad Company, or of those who controlled the Paducah and Memphis Railroad Company subsequent to the consolidation of 1872.   The defendants in error obtained the bonds in suit from the Paducah and Memphis Railroad Company, paying value therefor, and, so far as the record discloses, without any reason to suspect their payment would be resisted by the county.   In view, then, of the conduct throughout all these proceedings of those who represented the county of Tipton, it is estopped, by every consideration of law, justice, and fair dealing, from disputing its liability to defendants in error upon the bonds in suit.   The discovery by the county, in February, 1875, of fraud and corrupt practices upon the part of the Mississippi River Railroad Company, in procuring the issue of the bonds in 1869, cannot be permitted to affect the rights of those who had, in good faith, acquired the bonds in reliance upon the explicit assurance which the county, in effect, gave in October, 1871, that it would provide for the payment of the bonds and their coupons.   The defendants in error having obtained the bonds under the circumstances which have been detailed, may rightfully invoke, in support of their claims, any facts which would have estopped the county from disputing the claim of the Paducah and Memphis Railroad Company, had the latter company never parted with the bonds.

There are other grounds arising upon the evidence upon which the judgment below might, perhaps, be sustained, and there are other questions suggested in argument upon which we deem it unnecessary to comment.

MR. JUSTICE SWAYNE and MR. JUSTICE STRONG participated in the decision of this case in conference before their retirement, and we are authorized to say that they concur in this opinion and judgment.

*Judgment affirmed.*

NOTE. — *County of Tipton* v. *Norton* and *County of Tipton* v. *Edmunds*, error from the same court, were argued at the same time by the same counsel as the preceding case, and, upon its authority, the judgments therein rendered were affirmed.