KELLY and another *v.* TOWN OF MILAN.

*(Circuit Court, W. D. Tennessee. October 22, 1884.)*

1. MUNICIPAL BONDS—RAILROAD SUBSCRIPTION—TENNESSEE CODE, §§ 1142–1165 —ACTS OF TENNESSEE, 1871, *c.* 50—CODE § 491*a*—ACT 1872, *c.* 20—CONSTITUTION OF TENNESSEE, ART. 2, § 29.

There is nothing in the constitution of Tennessee, art. 2, § 29, or the act of 1871, *c.* 50, Code, § 491*a*, to enforce it, nor in the Code, §§ 1142–1165, nor in the act of 1872, *c.* 20, to authorize municipalities in Tennessee to issue bonds in aid of a railroad enterprise, either directly or in payment of subscriptions to its capital stock.

2. SAME SUBJECT—IMPLIED POWERS.

Neither can the power to issue such bonds be implied from any power conferred by these acts, nor from the general law governing municipalities. It can only exist by some special law applicable to the particular municipality, or some general law granting it. The doctrine of the case of *Green* v. *Town of Dyersburg*, 2 Flippin, 477, on this subject, reasserted.

3. SAME SUBJECT—CASE IN JUDGMENT.

Where a town, by a vote of the people, subscribed $12,000 in aid of a railroad enterprise in consideration that the road should pass through said town, issued its bonds for that sum, and received a like sum in the stock of the railroad company, *held*, that the bonds were void for want of legislative authority to issue them.

4. SAME SUBJECT—RECITALS—ESTOPPEL.

And where the bonds recited on their face that they were isssued "in pursuance of law," and one of the statutes relied on provided that towns having more than 1,000 inhabitants might issue bonds in payment of their matured

liabilities, the recital docs not estop the town from showing that in fact it did not have the requisite population ; because neither by the statutes nor by any other law was the duty devolved on the officials issuing the bonds, or the town itself, to ascertain the population. It was a matter *in pais*, as much open to the payee and holders of the bonds to ascertain as to the town itself.

5. SAME SUBJECT—RES ADJUDICATA—CONSENT DECREE—RATIFICATION.

Nor is the town estopped from making the defense of a want of legislative power by reason of the fact that certain tax-payers and the board of mayor and aldermen filed a bill in chancery setting up the want of power and enjoining the original holder from negotiating the bonds; in which suit, the railroad company having demurred, there was a compromise agreement between the parties that the town should take the stock and issue the bonds, that the court should declare them valid, overrule the demurrer and dismiss the bill ; and that in pursuance of the agreement a decree was, by consent of parties, entered on the minutes of the court reciting the agreement and decreeing according to its terms. Such decrees, when pleaded as *res adjudicata*, are not binding, and a town cannot by such a process either ratify its void bonds or preclude itself from making the defense when sued upon the coupons by a subsequent holder for value. Conflicting authorities on this subject reviewed, and the rule stated with its limitations and restrictions.

6. PRACTICE—WAIVING JURY—REV. ST. § 649.

The stipulation to submit a case to the court without a jury must distinctly waive a jury according to the terms of the statute.

This suit was brought to recover of the defendant an indebtedness evidenced by 144 coupons of $35 each, cut from its certain 12 bonds, together with 7 per cent. interest thereon. The defendant filed a plea of *non est factum* under oath, and a plea that plaintiffs were not *bona fide* holders, without notice, etc. The plaintiffs joined issue, and, under the Tennessee practice, by leave of the court, further filed a replication, to which the defendant rejoined, and plaintiffs demurred to the rejoinder. The replication, rejoinder, and demurrer are as follows :

### REPLICATION.

And the said plaintiff comes, and for replication to the defendant's plea above, says that heretofore, in the chancery court for the county of Gibson, in Tennessee, at Humboldt, and before one of the chancellors of said state, the defendant instituted suit against the payee of said bonds, and certain other persons, holders thereof, by filing its bill in said chancery court against said Mississippi Central Railroad Company, H. S. McComb, and others, alleging that said bonds were invalid, and praying to have same so adjudged, and to be surrendered to the defendant herein and cancelled; and thereafter, to-wit, on the —— day of January, 1875, in said chancery court, a court of competent jurisdiction, said parties, complainants and defendant, being before the court, a decree final was rendered, adjudging and decreeing that said bonds and coupons were legal, and valid and binding obligations against said complainant therein, the town of Milan, who is the same defendant herein, a full and true copy of which decree is herewith filed as a part and parcel of this replication, as though herein set forth in so many words. Wherefore the plaintiff says that said matters are *res adjudicata*, and this the plaintiffs reply to defendants' said plea above, and are ready to verify, etc.

HOLMES CUMMINS, Attorney for Plaintiff.

### REJOINDER.

(1) And now comes the defendant, and, for rejoinder to the plaintiff's replication setting up the defense of *res adjudicata*, says that the said decree relied upon for said defense, while rendered in the cause mentioned in said

replication, is not conclusive on it and ought not to affect its right, and because it avers, sets forth, and pleads that said decree was brought about and procured by imposition, combination, and fraud between the said A. M. West, as vice-president of the New Orleans, St. Louis & Chicago Railroad Company, and the agents and attorneys of this defendant, by which a decision and sentence in said cause of the court upon the matters involved for trial were prevented, and that said decree was designed as no honest exposition of the merits of the case, but was brought about, allowed, and consented to for the purpose of giving the same effect as *res adjudicata* upon points in litigation not honestly contested. (2) And for further rejoinder to said plea of *res adjudicata* this defendant says it ought not to be concluded or estopped by said decree, because it was not the result of honest litigation or the judgment of the court upon the issues involved in said cause, but was brought about and founded upon the unauthorized consent of certain agents and attorneys of defendant, who had no power to give such consent or bind defendant in the premises. (3) And for further rejoinder to said plea of *res adjudicata* the defendant says that it ought not to be concluded by said decree, for the reason that the same was not rendered upon the issues involved in the cause in which it was pronounced, and the court rendering the same was without power to bind or conclude this defendant thereby. (4) And for further rejoinder the defendant says it is not concluded by said decree, because it was not rendered in favor of a party to the record, but in the interest and behalf of a stranger thereto, who colluded with the agents and attorneys of this defendant, and thereby prevented and defeated the honest and earnest litigation which said cause was instituted for the purpose of having tried and determined. (5) And for further rejoinder, the defendant says it ought not to be concluded by said decree, because the suit in which it was pronounced was begun by defendant for the purpose of honestly and earnestly contesting and having declared void certain so-called bonds executed in the name of the defendant, but without authority or power to bind defendant by the same, and thereafter certain persons combined with the agents and attorneys of this defendant to defeat the purposes of said litigation and to procure a decree without trial and sentence of the court, but by the unauthorized consent of the agents and attorneys of defendant, and, without the point being, in fact, litigated, to have said bonds declared valid and binding obligations of this defendant, in the manner so stated in said decree, all of which was the result of fraud and collusion, therefore without force and effect as *res adjudicata;* the said bonds so pretended to be declared valid by said fictitious litigation being the same bonds on which the coupons sued on in this action were attacked.

SP'L HILL, and
GANTT & PATTERSON,
Attorneys.

### DEMURRER.

In this cause said plaintiffs demur to the several rejoinders filed herein by the defendant to the replication of the plaintiff herein, and for causes of demurrer say: *First.* Neither of said rejoinders, nor the matters therein set up and pleaded, constitute any defense in law, and are not sufficient in law for answer or defense to plaintiffs' said replication of *res adjudicata* or estoppel by judicial decree. *Second.* That defendant, having been a party to said cause and decree set up and pleaded in plaintiffs' said replication, cannot be heard in this collateral proceeding to aver or plead that said decree final, etc., was procured by fraud or collusion or imposition. Said defendant being a party to that cause and that decree, can only avail itself of such matter against it by a direct proceeding to annul the said decree for such fraud, etc. *Third.* That defendant in this collateral proceeding cannot avail itself of the matter that the action of its agents, in consenting to said decree set up by

plaintiffs in their said replication, was unauthorized, etc., because defendant can only act through its mayor, its chief executive, and to impeach said decree for that account must so do in a direct proceeding for that end, defendant having been a party thereto. *Fourth.* That said chancery court being a court of general jurisdiction, and in said cause that jurisdiction having been invoked by defendant as complainant therein, it is concluded by said final decree as to all questions involved in the subject-matter therein, and said decree adjudges the same issue against defendant that it now sets up anew. *Fifth.* And that defendant, being a party to said cause and said decree, is bound thereby until same has been set aside in a direct proceeding for that end, and cannot in this collateral proceeding plead that either a stranger or a party thereto colluded with defendants' agents to prevent and defeat honest and earnest litigation therein.

Wherefore, etc.

HOLMES CUMMINS,
Attorneys for Plaintiffs.

The following stipulation of the parties was thereupon entered into and filed as a part of the record in the suit:

### STIPULATION.

In this cause it is agreed between the parties that the statements herein are true, and the same may be used and relied on by either or both parties, as evidence on any hearing or trial of this cause, or on any motion for a new trial, same being the facts connected with matters in controversy, viz.:

*First.* That the coupons sued on were issued with and represent interest upon bonds issued by defendant in payment of a stock subscription made by defendant on the ——— day of —————, 187—, to the Mississippi Central Railroad Company. Said subscription was for the sum of $12,000, and in payment thereof (12) twelve bonds, each for the sum of $1,000, were issued, bearing date the ——— day of —————, 187—, and payable 20 years thereafter, with said coupons and others of like amounts thereto attached, representing the interest on said bonds.

*Second.* That at the time of making such subscription said railroad company was about to extend its line from Jackson, Tennessee, to Cairo, Illinois, and said subscription was to aid in making such extension, and to secure its location through defendant's town.

*Third.* That said railroad extension was completed on the ——— day of —————, 1873, the same running through defendant's town limits as it stipulated for; and the same has been operated ever since that date.

*Fourth.* The following is a copy of one of said bonds, the others being the same except as to numbers:

"No. 1. $1,000.

*"State of Tennessee, Town of Milan:*

"Be it known, that the town of Milan, by its mayor and aldermen, in consideration of the location of the Mississippi Central Railroad by said town, the citizens thereof, in pursuance of the laws of Tennessee authorizing the same, have agreed to issue bonds payable on twenty years' time, to the amount of twelve thousand dollars, with annual interest at seven per cent., with coupons attached, in bonds of one thousand dollars each.

"And whereas, the people of Milan voted the same by a majority, and in the form required by law, the vote being in pursuance of due notice, and in all respects according to the laws of Tennessee, said bonds to be payable to the Mississippi Central Railroad, under lease and control of the Southern Railroad Association.

"Now, be it known, that the town of Milan, by its mayor and aldermen, in pursuance of the authority given by the people thereof, and in obedience

to the duty required of them, issues and delivers this bond, being one of twelve, and said town of Milan hereby acknowledges itself to owe and be indebted to ——— or bearer in the sum of one thousand dollars, which sum said town of Milan binds itself to pay in lawful money of the United States to the Mississippi Central Railroad Company, or to the order of the Southern Railroad Association or bearer, in the city of New York, on or before the first day of July, in the year of our Lord one thousand eight hundred and ninety-three, with interest at the rate of seven per cent. per annum, payable annually on the first day of July of each year, on presentation of the proper coupons hereto annexed. And the town of Milan, by its mayor and alderman, hereby pledges the legal responsibility and the faith of said town for the payment of said coupons and bond according to the terms and effect hereof.

"In testimony whereof, the mayor and aldermen of the town of Milan have caused the signature of the mayor to be hereto set, and the seal of the corporation to be affixed, this first day of July, 1873, A. D.

"A. JORDAN,

[L. s.]                                              "Mayor of the Town of Milan."

*Fifth.* That on or about the tenth of July, 1874, said A. Jordan and others, residents and tax payers of said town of Milan, instituted proceedings in one of the courts of chancery of said state, to-wit, in the chancery court at Humboldt, in Gibson county, for the purpose of avoiding the liability of said town upon said bonds, the said railroad company and others being made defendants thereto.

The following is a full and true copy of said proceedings and of the decree, the same being final, rendered by said chancery court thereon. Said decree was not appealed from and still remains in full force, viz.:

"THE BILL.

"*To the Hon. John Somers, Chancellor, holding the Chancery Court at Humboldt, Gibson County, Tenn.:* Complainants A. Jordan, W. J. House, J. G. Boyd, M. L. Baird, Wilson G. Williamson, S. F. Rankin, and J. H. Dickinson show to your honor that they are citizens and residents of the town of Milan, in the Thirteenth civil district of said county; that said town of Milan is by law an incorporated town or city, and complainants reside within the corporate limits, and are tax-payers within said corporation; and the said Jordan is the legally elected and qualified and acting mayor of said town, and the other complainants are the aldermen of said town, duly elected and qualified, and together constitute the board of mayor and aldermen in and for said town or city.

"Complainants further show that they were duly qualified, and entered upon the discharge of their duties as mayor and alderman of said town, on the twelfth of January, 1874, and their term of office continuing for one year from the date of qualification.

"Complainants further show that upon an inspection and examination of the minutes and record of the proceeding of their predecessors in office, they find the following entry, of date May 11, 1872: 'The board was convened by order of the mayor. Present—A. Jordan, mayor; W. M. McCall, M. B. Harris, J. H. Dickinson, J. M. Douglass, W. E. Reeves, W. H. Algea, aldermen. On motion, it was ordered that 12 bonds, of $1,000 each, with coupons attached, payable 20 years after issuance, bearing interest at 7 per cent. per annum, be issued by the corporation of the town of Milan, Tennessee, to the Mississippi Central Railroad Company, upon the following conditions, namely: That the Mississippi Central Railroad Company be extended from Jackson, Tennessee, to the town of Milan, and intersect or cross the Memphis & Louisville Railroad at the point agreed upon by Col. Read, chief engineer of the Mississippi Central Railroad, and the committee on behalf of the corporate

authorities of the town of Milan, near S. P. Clark's residence; the interest on said bonds to be paid annually; and that the town marshal open and hold an election on the twelfth day of June, 1872, within the corporate limits of said town, for a ratification or rejection of said proposition;' and on the seventeenth day of June, 1872, said board again met, when the following proceedings were had, as appears from the said minutes: 'The board met pursuant to adjournment. Present—A. Jordan, mayor; W. M. McCall, M. B. Harris, J. M. Douglass, W. H. Algea, and W. E. Reeves, aldermen. The minutes of the former meeting were then read and adopted. The election was held on the twelfth day of June, 1872, for the ratification or rejection of the action of the board of mayor and aldermen of the town of Milan, in regard to the issuance of the $12,000 in bonds to the Mississippi Central Railroad Company, upon certain conditions. The returns of said elections show a vote of 117 for subscription, and two no subscription;' and at the same meeting appears the following entry: 'W. M. McCall and W. H. Algea were appointed a committee to correspond with Judge Milton Brown, of Jackson, Tennessee, in regard to the proposition of Milan corporation in regard to issuing the $12,000 in bonds to the Mississippi Central Railroad Company.' Complainants show that the foregoing entries, all of which appear upon the minutes of said board of mayor and aldermen, constitute all the proceedings in regard to the subscription of said $12,000 in bonds, and in regard to the election held for ratification or rejection of their action in directing the issuance of said bonds. Complainants charge that there is nothing to show the manner in which said election was held, or by whom the returns thereof were made, nor is there anything to show that the required number of votes were polled in favor of said proposition, as required by law.

"Complainants further charge that the order or ordinance of said board directing the issuance of said bonds was wholly without authority, illegal, and void: *First*, because, as they charge, that said ordinance was adopted and said election ordered without any previous, contemporaneous, or subsequent application, in writing or otherwise, to said board for said purpose by commissioners appointed to open subscription books, for stock to said board, or by the board of directors themselves, or by any one else authorized so to do, as required by section 1144 of the Code of Tennessee; and, *secondly*, because said election was ordered to be held and was held by the town marshal or constable, and not by the sheriff of the county of Gibson, as required by section 1143 of the Code of Tennessee in such cases; and, *thirdly*, because, as they charge, the said marshal, after the polls were opened at said pretended election, and before they were declared closed, either by himself or some pretended deputy, removed and suffered to be removed from the place in said town fixed for holding elections and receiving ballots, the ballot-box, or box in which the votes were deposited, to various other places in said town, and did at these various places receive and put into the ballot-box the votes of certain persons offered for said purpose at these various places not fixed by law as a place of voting at said election, and this, too, without any authority whatever; and, *fourthly*, because, as they charge, there was not only no application made to said board, as required by section 1144 of the Code, but that none could have been properly made at said time, because, as they expressly charge, the entire line of the contemplated road in which the stock was to be taken had not been surveyed by a competent engineer, and substantially located by designating the *termini* and approximating the general direction of the road, and no estimate of the grading, embankment, and masonry had been made by the engineer of said road, or any one else authorized to do so under oath or otherwise; and no such estimate as required by section 1145 of the Code of Tennessee has ever been filed with the board of mayor and aldermen of said town by any one. And, *lastly*, complainants charge, on information and belief, that at the time of ordering said election,

and at the time it was pretended to be held, the population of the town of Milan was less than one thousand inhabitants, and therefore not authorized by law to take stock in railroads, issue bonds, or levy a tax for their payment. Notwithstanding all these facts, the said board of mayor and aldermen did on the twenty-third day of June, 1873, make the following order, to-wit: 'On motion of W. M. McCall the mayor was instructed to issue twelve bonds to the said Mississippi Central Railroad Company of the denomination of $1,000 each, with interest from date of issuance at the rate of 7 per cent. per annum,' and thereupon said mayor did prepare 12 bonds, designated as the 'Bonds of the Town of Milan,' of $1,000 each, payable to the Mississippi Central Railroad Company, or bearer, 20 years from date of issuance, and dated July 1, 1873, bearing 7 per cent. interest per annum, to which bonds then were attached coupons for the payment of said interest on the first day of July of each year said bonds have to run. Each one of said bonds, and the coupons thereto attached, were signed by A. Jordan, mayor and recorder, and were issued on that date. And on the fourth day of August, 1873, said bonds, with the coupons attached, were delivered to said Mississippi Central Railroad Company through James Hall, the treasurer and cashier of said road, who executed the following receipt:

"'MILAN, August 4, 1873.

"'Received from A. Jordon, mayor of Milan, Tennessee, twelve thousand dollars in bonds of the town of Milan, Tennessee, 12 bonds of $1,000 each, payable first July, 1893, interest at the rate of 7 per cent. per annum, payable annually on the first July in each year.

"'JAMES HALL, Cashier Southern R. Association.'

"Said bonds and interest were made payable, as —— believe, in the city of New York, N. Y.

"Complainants further charge that said bonds, with the coupons, one year's interest on which was due July 1, 1874, are still in the possession of said Hall, or some other officer or agent of said Mississippi Central Railroad Company, or under their control and management; and complainants are advised that they are attempting to collect the interest due on said bonds. Complainants are advised that they are not bound, as a corporation or otherwise, to pay said bonds; that their issuance was contrary to law; but they are advised that should said company sell said bonds to innocent purchasers, they would be bound in law to pay the same; and they are advised and believe, and so charge, that the officers of said road will sell and assign said bonds with the view of making said corporation of Milan liable, if they have not already done so in part.

"Complainants further charge that said Mississippi Central Railroad Company, by its officers and agents, as they are advised and believe, and so charge, are attempting to negotiate said bonds, and will do so unless restrained by the timely interposition of your honor's writ of injunction. The premises considered, complainants pray that they be allowed to file this bill in their official capacity, and as individual tax-payers of the town of Milan, for themselves, and on behalf of all the tax-payers of said town, against the said Mississippi Central Railroad Company, under lease and control of the Southern Railroad Association, which said railroad is located and operated through the Thirteenth civil district in Gibson county, Tennessee, with an office and place of business in the town of Milan, in said Thirteenth civil district, and a local agent or agents there, and against James Hall, treasurer, and a citizen of Madison county, Tennessee; and against H. S. McComb, who is the president of said Mississippi Central Railroad Company, under lease of the Southern Railroad Association, and is a citizen and resident of New York city, in the state of New York; that spa's and copy issue to sheriff of Gibson county, Tennessee, commanding the said Mississippi Central Railroad Company to

answer this bill; that spa's and copy issue to Madison county, Tennessee, requiring said James Hall to answer this bill on oath, and state in whose possession and under whose control said bonds are, and if assigned, sold, hypothecated, or otherwise disposed of, let him state when, where, to whom, and for what consideration; that publication be made as to said H. S. McComb, requiring him also to answer under oath to the interrogatories put to James Hall, and that in the mean time let an injunction issue, restraining said Mississippi Central Railroad Company, as well as the said James Hall, and H. S. McComb, and all the officers, agents, and attorneys of said company, or of the said Hall and McComb, from selling, transferring, assigning, pledging, or in any other manner disposing of said bonds or coupons thereto, or from collecting the same; and on final hearing, they, for themselves and other tax-payers, pray that said bonds and coupons be delivered up and canceled; that said injunction be made perpetual; and if it should appear in the progress of the cause that any of said bonds have been disposed of to third persons, they ask to have them made defendants, if necessary, for the protection of the rights of their ———. And they pray for general relief. This is the first application for writs of injunction in this cause.

"JOHN L. WILLIAMSON, Sol.

"*State of Tennessee, County of Haywood:* Personally appeared before me, Alexander Duckworth, C. and M. chancery court, at Brownsville, Haywood county, Tennessee, Arch Jordan, one of the complainants in the foregoing bill, and made oath in due form of law that the facts set forth in the foregoing bill as of his own knowledge are true, and those on information he believes to be true. "ARCH JORDAN.

"Subscribed and sworn to before me, this July 10, 1874.
"ALEX. DUCKWORTH, C. and M.

"*State of Tennessee, Haywood County:* The clerk and master of the chancery court at Humboldt, Tennessee, will issue the writ of injunction as prayed for in the foregoing bill, upon complainant's giving bond with security in the sum of one thousand dollars, conditioned and payable as required by law in such cases. H. J. LIVINGSTONE,
"*July* 10, 1874. Chancellor Tenth Chancery Division of Tennessee.

"THE DEMURRER.

"In the Chancery Court at Humboldt, Tennessee.

"*A. Jordan and G. Boyd, M. L. Baird, W. G. Williamson, S. F. Rankin, J. H. Dickinson* vs. *Miss. Cent. Railroad, H. S. McCombs, and James Hall.*

"The defendants demur to complainant's bill, and for cause of demurrer say: *First*, because there is no equity in the bill of complainants to entitle them to a decree; *second*, because the bonds having been determined by order of the board of mayor and aldermen, as alleged in the bill of complainants, they cannot set up irregularities or departure from duty on part of themselves to evade responsibility on the bonds; *third*, because complainants do not allege or pretend that the railroad company has failed to keep its contract; *fourth*, because the allegation on which the decree is asked to relieve the town of Milan from payment of its bonds rest on the misconduct and irregularities of its corporate authorities, and the corporation cannot take advantage of its own wrong.

"Defendants, therefore, pray judgment whether they should any other or further answer make to complainants' bill.
M. BROWN, Solicitor for Defendant.

"And the following is the final decree thereon:

*"A. Jordan, W. I. House, J. Q. Boyd, M. L. Baird, W. Y. Williamson, S. F. Rankin et als., Mayor and Aldermen of the town of Milan,*
vs. *The Mississippi Central Railroad Company,*
*H. S. McComb, and James Hall.*

"Be it remembered that this cause, this ninth of January, 1875, came on to be heard and was heard before Hon. John Somers, chancellor, etc., and it appearing that this suit had been settled by the following agreement, to-wit:

"Whereas, the board of mayor and aldermen of the town of Milan, in Gibson county, Tennessee, have filed a bill in the chancery court at Humboldt, against the Mississippi Central Railroad Company, to enjoin the collection of certain bonds issued by the town of Milan to aid in the construction of said road, to-wit, twelve bonds of $1,000 each, with coupons attached, and said suit is now pending in said court; and whereas, it is agreed by and between said corporation of the town of Milan and the New Orleans, St. Louis & Chicago Railroad Company, into which said Mississippi Central Railroad Company has been merged by contract of consolidation between said last-named company and the New Orleans, Jackson & Great Northern Railroad Company, that said suit be compromised as follows, to-wit: The said New Orleans, St. Louis & Chicago Railroad Company is to issue to the town of Milan certificates of stock in the sum of $500 each, dollar for dollar for the said bonds, and the said town of Milan on their part agrees, on receipt of said stock, to let a decree be entered in said cause in favor of the validity of said bonds, which are to be redelivered with the seal of the town affixed, and the cost of said suit to be paid by said New Orleans, St. Louis & Chicago Railroad Company.

"In testimony whereof, we herewith sign our names and affix our official seal, this December 18, 1874.                    A. JORDAN, Mayor.
                                        "A. M. WEST,
"Second Vice-President N. O., St. Louis & C. R. Co.

"In pursuance of this agreement, and by consent of the parties, it is ordered, adjudged, and decreed that the New Orleans, St. Louis and Chicago R. R. Co. shall issue to the town of Milan certificates of stock in said company in sums of $500 each, dollar for dollar, for said twelve bonds of $1,000 each, referred to in the bill; and it is further ordered, adjudged, and decreed that, on the presentation of these certificates of stock, the town of Milan shall have the corporate seal of said town affixed to each of said twelve bonds, and delivered to H. S. McComb, to whom they rightfully belong, or his authorized agent, and said bonds and coupons attached are declared to be valid and binding on said town and its authorities. It is, by consent, further ordered, adjudged, and decreed that the injunction be dissolved; the demurrer herein filed be and the same is hereby overruled; and this decree is declared a final settlement of the right of the parties. The New Orleans, St. Louis and Chicago Railroad Company to pay the costs, and this case only retained on the docket so far as is necessary to enforce the final execution of this decree."

*Sixth.* It is further agreed that the plaintiffs may file and read the affidavit of S. F. Rankin, R. F. Harris, or other residents of said town, and that the defendant may file and read the affidavits of E. A. Collins, S. H. Hale, and David Taylor; such affidavits to relate to the question of the population of said town in 1873, and to be considered as evidence herein.

It is further agreed that, upon the consideration of this motion for a new trial, the defendant shall not be prejudiced by the default herein taken, but the court will consider the case as now on trial on its merits, and render judgment accordingly; and, on any appeal taken, this shall be the bill of exceptions, with other parts of the record. That the records of said town were destroyed by fire in 1879, and no census, authorized by law, of the town was

taken before 1880, when the population was ascertained to be 1,600. That in another suit by other parties against said defendant, not affecting the issue herein, it was proven by A. Jordan, the then mayor of said town, as follows: *Question.* "State if, at the election on said proposition, three-fourths of the qualified voters of said town voted in favor of subscribing the bonds, as compared with the gubernatorial election next preceding the same; and if you know how many votes were so polled in favor of said proposition, and how many against, please state it." *Answer.* "I don't know; my recollection is that there were 60 for it, and three votes against it. The voting population was about 250." This was in reference to another proposed subscription by said town to the Tennessee Central Railroad Company, which has been declared invalid by the Tennessee supreme court.

It is further agreed that said railroad was not completed to said town until after July, 1873.

*Seventh.* That after said final decree in said chancery court the plaintiffs became the owners of said bonds, with the coupons attached, purchasing some for value and before due. Said copy of bill in Humboldt chancery, affidavits, and briefs of counsel will be filed with Hon. E. S. Hammond, judge, etc., on or before fifteenth of December, 1883, and the cause be then submitted upon this record. That in the proposition submitted to the voters in defendant town the question of subscribing $12,000 to the stock of said railroad company, payable in said bonds, was also submitted in one question, and at one and the same time, and was so approved by the requisite majority.

It is agreed that the original agreement under which said chancery decree was rendered is not on the file and has been lost.

HOLMES CUMMINS, Attorney for Plaintiffs.
SP'L HILL, Attorneys for Defendants.

The statutes of Tennessee relied upon to support the bonds are the following:

CODE OF TENNESSEE.

1142. Any county, incorporated town, or city may subscribe for stock to an amount not exceeding in the aggregate one-fifteenth (amended to one-tenth) of its taxable property, nor more than one million dollars, in railroads running to, or contiguous thereto, upon the following terms and conditions:

1143. The approbation of the legal voters of the county, town, or city, to the proposed subscription, must first be obtained by election held by the sheriff in the usual way in which popular elections are held.

1144. The election may be ordered by the county court or corporate authorities of the town or city, upon the application in writing of the commissioners appointed to open the subscription books for the stock of such road, or of the board of directors, if the company is organized.

1145. Before such application can be made, the entire line of the road, in which the stock is proposed to be taken, shall be surveyed by a competent engineer, and substantially located by designating the *termini*, and approximating the general direction of the road, and an estimate of the grading, embankment, and masonry made by the engineer, under oath, and filed with the application.

1146. The election shall be advertised at least 30 days beforehand, by notices posted up at the different places of voting, specifying the time when it is to be held, for what road, the amount of stock proposed to be taken, and when payable.

1147. At the election thus held, those voters who are in favor of the subscription will put on their tickets the words "for subscription;" those opposed, "no subscription."

1148. If a majority of the legal voters of the county, town, or city, as the case may be, estimating the vote by the last preceding governor's election,

should be in favor of the subscription, the judge or chairman of the county court, or the mayor of the corporation, shall subscribe the amount of stock so voted for, in the name of the county or corporation.

1148a. That section 1148 of the Code be so amended as to read as follows, to-wit: If the majority of the votes cast of a county, town, or city, as the case may be, should be in favor of the subscription, the judge or chairman of the county court, or president of the board of county commissioners, or the mayor of the corporation, shall subscribe the amount of stock so voted for in the name of the county or corporation.

1148b. Should any county, town, or city fail to vote the subscription to any railroad company at any election held for the purpose, said county, town, or city may, at any time after thirty days, order another election, if desired by the railroad company; such election to be held by the commissioners of registration, as now provided by law.

1149. The money raised under the provisions of this article shall be expended within the county in which such stock is taken, or as near thereto as practicable.

1150. As soon as the stock is subscribed, it is the duty of the county court, or corporate authorities, to levy a tax upon the taxable property, privileges, and persons, liable by law to taxation within the county or corporation limits, sufficient to meet the installments of subscription as made, and the cost and expenses of collection, which tax shall be levied and collected like other taxes.

1151. The revenue collector, or any other person, may be appointed by the county or other corporate authorities to collect the railroad tax, who shall first give bond with good security, in double the amount of the installment proposed to be raised, payable to the state, and conditioned to discharge the duties of the office, and faithfully to collect, and pay over to the railroad company such railroad tax, upon which bond the parties are liable as in other official bonds.

1151a. The different railroad tax collectors shall have the power and authority to appoint deputies, not exceeding two, said deputies to have the same powers to collect the railroad tax as the collector himself.

1151b. The provisions of this act are intended to embrace railroad tax collectors who have gone out of office as well as those now in office.

1152. The clerk of the county court, or the proper officer of the corporation, shall make out duplicate lists of the railroad tax, showing the amount of tax each individual is to pay, estimated in conformity to the last valuation of the taxables, and in the proper proportion, one of which lists shall be delivered to the railroad tax collector, and the other retained by him and recorded in his office. He shall also make out and deliver to the railroad company an aggregate statement of such taxes.

1153. He will ascertain the tax on privileges, when necessary, by summoning before him the persons exercising the privileges, at the end of twelve months from the levy of the tax, and taking their statements on oath.

1154. Not more than thirty-three and one-third per cent. of the stock subscribed as above can be collected in any one year.

1155. The tax collector, as fast as he makes collections, shall pay the amounts over to the company.

1156. He shall also, as he receives the tax, give to each tax-payer a certificate in such form as the railroad company may prescribe, showing the amount of such tax paid by him, of which he shall retain a duplicate, to be delivered to the president of the railroad company, and such certificate is negotiable by delivery or assignment, and, with a deduction of its proportion of the cost of collection, is receivable in payment of either freight or passage on the railroad in which the subscription is taken; after the expiration of one year from the completion of such road.

1157. The holder of such certificates to the amount of one share or more of the stock of such railroad company is entitled to demand and receive from the company, in lieu thereof, a certificate of stock in the capital stock of such company, which will give him all the privileges of any other stockholder.

1158. The trustee of the county or recorder of the corporation subscribing stock shall settle annually with the railroad tax collector.

1159. On any default of the collector to settle or pay over railroad tax, as required, he shall be liable to the same proceedings provided for failures to pay over state or county revenue at the suit of the company.

1160. For the purpose of meeting unexpected contingencies, the county or corporation authorities may anticipate the collection of the railroad tax by the issuance of warrants, bearing six per cent. interest, and payable at such times as may be desired by the railroad company, the warrants to be received as payment of so much stock.

1161. In such a case a sufficiency of the railroad tax shall be paid into the county treasury to meet the warrants as they fall due.

1162. The county or corporation may appoint a proxy, from time to time, to represent the stock so subscribed in all meetings of the stockholders.

1163. The circuit court is authorized to issue a writ of *mandamus* to compel the county court, or the corporate authorities of a town or city, to carry into effect the provisions of this article, by ordering an election, subscribing stock or levying a tax, or other act, as the case may be.

1164. The county court or corporate authorities will fix the fees of the collector of the railroad tax and of the trustee, and allow the clerk or recorder such fees as are allowed them for similar services in regard to county and corporation taxes.

1164a. That collectors of railroad taxes be allowed the same fees that are now allowed to collectors of the state and county taxes for similar services. This act to have effect from and after its passage.

1165. The county court of any county having stock in any railroad may sell the same, by the consent of the people of the county, signified in the manner prescribed for authorizing county subscriptions.

### *Chapter* 50, *Acts* 1870–71.

An act to enforce article 2, section 29, of the constitution, to authorize the several counties and incorporated towns in this state to impose taxes for county and incorporation purposes.

Section 1. Be it enacted by the general assembly of the state of Tennessee, that the several counties and incorporated towns in this state may, and are hereby authorized to, impose taxes for county and corporation purposes, respectively, in the following manner and upon the following conditions: (1) That all taxable property shall be taxed according to its value, upon the principles established in regard to state taxation. (2) The credit of no county, city, or town shall be given or loaned to or in aid of any person, company, association, or corporation, except, first, upon the consent of a majority of the justices of the peace of the county, at a quarterly term of the county court of such county, or a majority of the board of mayor and aldermen, as the case may be, of such city or town, and upon an election afterwards held by the qualified voters of said county, city, or town, and the assent of three-fourths of the votes cast at said election. The said county court or board of mayor and aldermen, as the case may be, shall spread upon their records the proposition and the amount to be voted upon by the people, and shall have full power to hold and conduct such elections according to the laws regulating elections in this state; and if the assent of three-fourths of the voters of such county, city, or town is had, then the county court or board of mayor and aldermen, as the case may be, shall have full power to make and execute all necessary orders, bonds, and payments, in order to carry out such loan or

credit voted for as prescribed in this act; nor shall any county, city, or town become a stockholder with others in any company, association, or corporation, except upon a like election, and the assent of a like majority, as prescribed in this act.

Passed January 23, 1871.

### Chapter 20, Acts 1872.

An act to authorize the mayor and city council, or mayor and board of aldermen, of any incorporated city or town in the state of Tennessee, having a population of from one thousand and upwards to twenty thousand inhabitants, to issue bonds of said city or town to the amount of $15,000.

Section 1. Be it enacted by the general assembly of the state of Tennessee, that the mayor and city council, or the board of mayor and aldermen, of any incorporated city or town in the state of Tennessee, having a population of from one thousand to twenty thousand, are hereby authorized in their corporate capacity to issue the bonds of the said city or town, signed by the mayor, and countersigned by the recorder of said city or town, with coupons for interest attached, to an amount not exceeding fifteen thousand dollars. The bonds herein provided for may be executed of denominations from twenty-five to five hundred dollars, at direction of said mayor and city council, or mayor and aldermen, and to mature at such times as may be fixed by said mayor and city council, or mayor and aldermen, from one to twenty years after date, and bearing interest at the rate of eight per cent. per annum, payable semi-annually, the past-due coupons on which bonds shall be receivable for taxes, and all other dues to the corporation issuing the same: Provided, that the bonds issued under the provisions of this act shall be alone for the purpose of paying outstanding liabilities against the city or corporation issuing them; and shall not in any case exceed the unsettled and matured liabilities or debts of such city or corporation at the time of issuance thereof; but in no event shall the bonds be issued without the consent of three-fourths of the qualified voters voting at an election to be held for that purpose under the supervision of said mayor and city council or board of aldermen.

Sec. 2. Be it further enacted, that the said mayor and city council, or mayor and aldermen, of said city or town are hereby authorized to issue at par such coupon bonds as are provided for in this act, to the holders of *bona fide* claims against said city or town, in liquidation and discharge of such claims and interest thereon, and to such others as are willing to take them at par, not to exceed in amount said sum of fifteen thousand dollars, provided that such bonds shall not be sold for less than par, and that the interest rate shall be stated in the submission to the popular vote: Provided, that in no case shall said mayor and city council, or mayor and aldermen, of said city or town, as the agent for that purpose, sell under the par value any of these bonds, the issuance of which is authorized by this act: Provided, further, that the proposed rate of interest the bonds are to bear shall be specified, and submitted to the vote of the inhabitants of such corporations, at the time the election is held in regard to the issuance of the bonds.

Passed March 18, 1872.

*Holmes Cummins,* for plaintiffs.

*Sp'l Hill* and *Gantt & Patterson,* for defendant.

Before MATTHEWS, Justice, and HAMMOND, J.

HAMMOND, J. When this case was first heard there had been a judgment by default against the defendant, and on motion to set it aside the parties stipulated that, on the agreed state of facts, the court should determine the whole controversy, and render judgment accord-

ing to the facts and law of the case. There were no pleadings whatever except the declaration, and this anomalous condition of the record rendered it quite impossible to do what the parties wished, since there were no issues to which to apply the facts; and the rights of the parties might largely depend on the issues to be made by pleadings. Hence the default was set aside and the parties directed to plead. This having been done, the case is again heard upon a stipulation as to the facts and by the court without a jury. But this stipulation, as it appears in the record, may not be broad enough to meet the requirements of the statute, for nowhere does it in terms say that a jury is waived. Rev. St. § 649. The parties are directed, therefore, before judgment is entered, to amend the stipulation or to file an additional one waiving a jury as required by this section.

This court had occasion, in the case of *Green* v. *Dyersburg*, 2 Flippin, 477, to consider very carefully the power of municipalties in Tennessee to issue bonds like these, under the general statutes relied on here, or any power to be implied from them or from the general municipal authority of corporations, and concluded such power does not exist. We think that decision is fully sustained by the supreme court of the United States and of the state of Tennessee. *Claiborne Co.* v. *Brooks*, 111 U. S. 400; S. C. 4 Sup. Ct. Rep. 489; *Wells* v. *Supervisors*, 102 U. S. 625; *Pulaski* v. *Gilmore*, MS. (Nashville, 1880.) It is true that in this last case the court reserved any decision as to what the legislature intended by reference to the "execution of all necessary orders, bonds, and payments, in order to carry out a loan or credit," in the act of January 23, 1871, *c.* 50, (Tenn. Code, § 491*a*;) but it is none the less true that it did distinctly decide that "there is nothing in this act that can possibly be construed, on any fair principle of construction, to authorize the issuance of these bonds in payment of a subscription of stock in a railroad company," as authorized by the act of January 22, 1852, *c.* 117, (Tenn. Code, §§ 1142–1165.) And it seems to us clear enough that the purpose of the act of 1871 was to conform the laws of Tennessee, general and special, to the new constitution of 1870, by authorizing all municipalities already in possession of a legislative authority to give or lend its credit in aid of any person, company, association, or corporation, or which might thereafter become possessed of such legislative grant, to take the consent of the corporate authorities and of the qualified voters, as required by the constitution, and thereafter "to make and execute all necessary orders, bonds, and payments, in order to carry out such loan or credit *voted for* as prescribed by this act," but *authorized* and prescribed by some other act passed for that purpose. It was not an act to authorize all counties, cities, or towns to give or lend their credit, and "execute all necessary orders, bonds, and payments in order to carry out such loan or credit," but simply one directing all counties, cities, or towns invested with that authority to take a vote of the people and comply

with the constitution. It was an act of regulation, and not one for
the creation, of municipal powers. Without the aid of the well-es-
tablished rule of strict construction of all acts granting this munici-
pal power to issue bonds in aid of auxiliary enterprises, the act of
1871 presents no difficulty, except in the somewhat too general indi-
cation of its purpose; with that aid all difficulties vanish.

It affords no argument against this construction of our legislation
if the fact be true, as suggested by counsel, which we do not concede,
however, that it has never been the habit of the Tennessee legislature
to authorize a gift or loan of credit by corporations in any other
manner than by becoming stockholders in the enterprise. This act
of 1871 was a general law to enforce a constitutional provision, and
in its nature was rather prospective than retrospective, and *non con-
stat* that some act may not be passed which would authorize such a
method of aiding corporate enterprises. Under some circumstances
the act of 1871 might apply to such an authority already given by
the legislature, if any such there be; but under all circumstances it
does apply to all future grants of power of that kind, and we are not
aided in the construction of the act by any inquiry whether such a
grant has ever been made or will be hereafter made by the legisla-
ture.

On the other hand, as is well known to those informed as to our
Tennessee legislation, although we have long had a system of munic-
ipal aid to railroads by stock subscriptions, the payment of which is
particularly regulated by statute (Tenn. Code, §§ 1142–1165) in a
manner which in no sense contemplates the issue of bonds, the par-
ties interested have been allowed in numerous instances, like that of
*Tipton Co.* v. *Locomotive Works*, 103 U. S. 523, to anticipate the
benefits of those subscriptions by issuing bonds in payment thereof.
But this has always been done by special laws that, providing for
the particular scheme adopted, regulate in detail the character of the
bonds to be issued, which is on plain business principles necessary
for the protection and benefit of all concerned. The absence of such
special legislation is, under the circumstances, an indication of the
legislative will that a given municipality shall be governed by the
general law of the Code regulating its subscriptions.

Since the constitution of 1870 no such special law is allowable,
and the authority can be given only by general statute. Const. 1870,
art. 11, § 8; art. 2, § 29. But for like prudential considerations
based on correct business principles, as well as a sound public pol-
icy for the protection of the general welfare, it is presumable that if
the legislature intended by any general law to authorize stock sub-
scriptions to be anticipated by the issue of bonds, thereby changing
the established system provided for in the Code, (sections 1142–1165,)
it would in that general law carefully prescribe, as it has always
done in the special laws, having that purpose in view, the character
of bonds to be issued, regulate the whole scheme with regard to its

details, and not leave the people who are to pay the money by taxation to the prey of speculators and corruptionists, who may, and too often do, feed upon such enterprises, guard them as carefully as we may. Particularly would this be expected of a legislature meeting under a constitution which had curtailed its powers for this very reason of improvident legislation, as was done by the constitution of 1870. Yet all prudential features of this kind are omitted from the act of 1871, which we are asked to construe as giving to the municipal corporations of Tennessee the most unbridled power to issue bonds in payment of their stock subscriptions that are otherwise so carefully guarded by the Code. We cannot do it.

Again, the constitution of Tennessee, in the very phraseology of article 2, § 29, recognizes the distinction referred to by counsel here between a credit "given or loaned to or in aid of any person," etc., and becoming "a stockholder with others in any company," etc., by taking pains to impose the same restrictions on each in separate clauses. They are in no way treated as the same thing; are not confused with each other nor joined together in any way; certainly not in the way the argument here would connect them, by relegating a stock subscription, with bonds to pay the subscription money, to the category of "giving or lending credit." And the act of 1871, c. 50, follows the same treatment found in the constitution by keeping these two things entirely distinct. The first clause of the second subdivision of the act relates wholly to the "giving or lending of credit;" and in this clause alone do we find the words so much relied on here as giving "full power to make and execute all necessary orders, bonds, payments," etc. It is in the second and last clause of that subdivision that we find the provision independently made for becoming a stockholder with others "upon a like election and assent of a like majority, as prescribed by this act," and in that clause there is no provision for making and executing "all necessary orders, bonds, payments," etc., though it can hardly be doubted that such power would exist where the corporation had authority under some legislative grant to issue bonds or make orders or payments for its stock subscriptions. This shows that it is an act of supplemental regulation directing an election in cases where before, and but for the constitution and this act, such an election was not required. We do not say that a power to issue bonds in payment of a stock subscription might not fall or be made to fall within a power "to give or lend credit to or in aid of any person, company," etc., but we do say that the constitution and this act of the legislature treat the giving or lending of credit as one thing and a stock subscription as another thing, and that naturally in such a division, if kept up as it seems here to have been done, the issuing of bonds to pay a stock-subscription would fall within the latter subject, and should receive no aid by implication or construction from provisions of the statute relating to the former. It is agreed everywhere that the canons of strict construction in such cases

forbid such liberal implications. It is only necessary implications that are ever indulged in any case; necessary in the sense of being the consequential effect of the use of the language employed, and without which implication the manifest purpose of the statute would fail. This kind of necessity is too often confounded with the necessitous circumstances of the private interests of the parties involved, which can in no sense influence a court in the interpretation of the legislative will. Dill. Mun. Corp. §§ 55, 81–90, 106. *Police Jury* v. *Britton,* 15 Wall. 566; *Wells* v. *Supervisors,* 102 U. S. 625; *Claiborne Co.* v. *Brooks,* 111 U. S. 400; 3. C. 4 Sup. Ct. Rep. 489; *Milan* v. *Railroad,* 11 Lea, 329, 334.

Legislative authority to support these bonds is sought to be derived from the act of March 18, 1872, c. 20, p. 44, "to authorize the mayor and board of aldermen of any incorporated city or town in the state of Tennessee, having a population of from one thousand and upwards to twenty thousand inhabitants, to issue bonds of said city or town to the amount of $15,000." The bonds here sued on are in denominations of $1,000, and bear 7 per cent. interest, payable annually; while those authorized by the act were to be "of denominations from twenty-five to five hundred dollars," and were to bear 8 per cent. interest, payable semi-annually. It was held in *Milan* v. *Railroad,* 11 Lea, 329, that this variation of denomination was not admissible, and that the interest could not be *increased.* A similar ruling was made in. *Green* v. *Dyersburg,* 2 Flippin, 477; Whether the mere change of denomination and a *diminution* of the interest would fall within the principle of these cases, or be held to be "a beneficial modification of the requirements of the statute,"—the fact of this non-compliance with the statute in the issue of these bonds affords an inference that they were not in fact issued under this statute, and that the resort to it is an after thought.

The act, as a whole and in its special features, seems to have contemplated a means of paying the ordinary corporate debts of the cities and towns designated, and not such extraordinary liabilities as arise from aiding the construction of railroads. The bonds issued were to be "alone for the purpose of paying outstanding liabilities," and were not in any case "to exceed the unsettled and matured liabilities or debts of such city or corporation at the time of issuing thereof." There is nothing in this record to show that at the date of these bonds there was outstanding against the town of Milan the sum of $12,000 of "unsettled and *matured*" liability for stock subscriptions to the railroad company. The recitals of the bonds state the consideration to be "the location of the Mississippi Central Railroad by said town," and they nowhere refer to any stock subscription whatever, or that they are in payment of the stock. On their face they indicate a direct vote of the bonds to the company without any con sideration other than the location of the road. In the bill filed in the state chancery court, wherein the minutes of the town proceedings

are set out, there is no indication of a prior stock subscription, and complaint is made that there was none; and the first step seems to have been a vote by the board to issue the bonds, and to direct an election at the polls "for a ratification or rejection of said proposition," and at the next meeting the entry is:

"The election was held on the twelfth day of June, 1872, for the ratification or rejection of the action of the board of mayor and aldermen of the town of Milan in regard to the issuance of the $12,000 in bonds to the Mississippi Central Railroad Company upon certain conditions. The returns of said election show a vote of 117 for subscription, and 2, no subscription."

Now, there do not here appear to have been any proceedings for a subscription of stock and an issue of bonds to pay it, but only a "subscription" of the bonds themselves. This would seem to indicate that the town was proceeding to give its credit or sell its bonds for the sole consideration of the location of the road, and this under the first scheme mentioned in the constitution and act of 1871, and not the second, the difference between which has been heretofore adverted to; and, so far as the records of the town are said to show, this is all that was ever done, though when we come to the compromise decree in the state court, the railroad *agrees* to issue its stock in payment of the bonds, this being the first time we hear of any stock being involved in the negotiations between the parties. Nevertheless, the parties, by their stipulation in this case, have agreed that the "bonds were issued by defendant in payment of a stock subscription made by defendant on the ——— day of ———, 187—, to the Mississippi Central Railroad Company." This is very indefinite, indeed, and there is nothing to show the date or other particulars of the subscription, nor whether it refers to the subscription made in the consent decree of the state court, or one made prior to the original action of the board as above set forth.

If we turn, however, to the Code of Tennessee, (sections 1142–1165,) under which alone the town could make a stock subscription, we find that the requirements of law, as therein declared, show that, if the record of the town correctly state all that was done, there could never be a more reckless disregard of those provisions. And the inference is almost irresistible that the town was not proceeding under the provisions of the Code at all. It would seem, therefore, quite impossible that the very indefinite stipulation of the parties in this case could refer to such a subscription, and that it rather refers to the subscription made by the consent decree in the state court, from which it will be seen that the bonds were, by agreement, "resealed" and "redelivered" at that date, viz., December 18, 1874. This would be, then, the date which should be filled in the blanks of the stipulation of the parties, as filed in this court. When so filled up, it is apparent that the town was not acting under the above-cited provisions of the Code, and that the plaintiffs can receive no aid from those provisions, but must stand by the contract as they made

it on December 18, 1874. The inevitable result would be that the town, in making *that* contract for stock subscription, was acting without legislative authority, and the debt for it was void. Wherefore, it could not, even under the powers granted by the act of 1872, lawfully issue bonds to pay it; since the act in terms, by section 2, restrained the issuance to holders of *bona fide* claims against the town, to say nothing of any other restriction of law on the subject.

But if it be conceded that the stipulation refers to some other stock subscription than that of December 18, 1874, as above mentioned, and one made prior and as preliminary to the original delivery of the bonds on July 1, 1873,—as, perhaps, the seventh section in its last clause intends to agree was the case,—that the town proceeded strictly under the Code in making that subscription, and under the act of 1872 in issuing the bonds, still it appears conclusively by section 1154 of the Code that "not more than thirty-three and one-third per cent. of the stock subscribed as above can be collected in any one year," and at most only one-third of the $12,000 subscription could have been at the date of the bonds an "unsettled and *matured* liability or debt." What is to be held to be the effect of this overissue we will not now inquire, for beyond all this there is a more fatal objection to the claim of power under the act of 1872, and we have taken the pains to point out these irregularities and glaring departures from the Code and the act of 1872 more to show how regardless this transaction was of the very statutes now relied on to support it, than to predicate our judgment upon them. And here we may remark, in reply to the argument that the town has received the consideration in its railroad facilities, that if its stock subscription be valid under the Code the remedy of the plaintiffs would be to proceed under the Code, to compel the collection of the tax to pay for the stock, and not to enforce bonds issued without legislative authority. No matter what the benefits received, all parties dealing with the town knew that it could not bind itself without legislative authority, and only in the manner so allowed.

The agreed statement of facts in this case leaves only one question of fact open for our determination, and that is whether the town of Milan had, at the time of the issue, the requisite "one thousand or more inhabitants" to bring it within this act of 1872. The learned counsel for plaintiffs frankly admits in his brief "that if we are to look to the proof in the record on that point, defendant's population is proven to have been under that limit," and we find the fact to be so. This would end all claim for power to issue these bonds under that statute, but it is insisted that defendant is estopped by the recitals in the bonds from denying that its population was sufficient to authorize the town to issue them. The bonds do not recite that the town had any given number of inhabitants, but only that they are issued "in pursuance of the laws of Tennessee;" that the people "voted the same by a majority, and in the form required by law, the

vote being in pursuance of due notice, and in all respects in accordance with the laws of Tennessee;" and that the board acted "in pursuance of the authority given by the people thereof, and in obedience to the duty required of them."

Under the well-established rules of decision on this subject these recitals are all sufficient to estop the town, as against a *bona fide* holder for value, from denying the fact of the sufficiency of population, and would be a plenary municipal decision of that fact if the town authorities were vested with power to decide the question. *Wilson* v. *Salamanca*, 99 U. S. 499; *Coloma* v. *Eaves*, 92 U. S. 484; *Marcy* v. *Oswego*, Id. 637; *Buchanan* v. *Litchfield*, 102 U. S. 278. There are many other cases to which these will be a guide. But the cases are carefully reviewed in the recent one of *Northern Nat. Bank* v. *Trustees Porter Tp.* 110 U. S. 608, (S. C. 4 Sup. Ct. Rep. 254,) and the rule is there laid down that this estoppel only operates when the duty of ascertaining the fact has been devolved by law upon the municipal or other authority which undertakes to determine it by the recital. The authority may be conferred by special legislation in the act authorizing the bonds, or elsewhere, or may grow out of the ordinary duties imposed by law upon the particular officers or agents. Now, there is not one word in this act of 1872 imposing the duty of ascertaining the population on the board of mayor and aldermen of the towns and cities referred to in the act, nor any provisions from which such a duty on their part may be fairly inferred. The "consent of three-fourths of the qualified voters voting at an election to be held for that purpose, under the supervision of said mayor and aldermen," is provided for, but this does not by any fair implication confer the power to take a census of the inhabitants. There is no general or special act of the legislature requiring these or any officers of our municipalities or of the state to take a census, or keep a record of any enumeration of their respective inhabitants. Generally, when our acts refer to population, and direct its ascertainment, they refer in terms to the federal census as the guide, and we have no law or practice of having municipalities discharge this duty. To do this is not a necessary duty growing out of general municipal power. Each municipality may act as it pleases in this regard. There was, then, no duty devolved on this board to ascertain or determine the fact of population, and their determination of it cannot be implied from the recitals in the bonds. It was a matter *in pais*, as much open to the payee of the bonds at the time of the contract, and since to the holders of them, as to others to decide for themselves. There is no pretense of any authority in the charter of the town or of the railroad company, or in any other act than those already considered, to support these bonds, and they were and are utterly void for want of legislative power. *Ottawa* v. *Carey*, 108 U. S. 110; S. C. 2 Sup. Ct. Rep. 361; *Lewis* v. *Shreveport*, Id. 282; S. C. 2 Sup. Ct. Rep. 634.

The next question which demands our attention is that arising out of the proceeding in the state chancery court which is pleaded as *res adjudicata*. If this be a good plea, we have the anomaly of a municipal corporation issuing bonds without legislative authority making those bonds valid, by an equally void agreement of its agents that they shall be so. We held in this court, the same judges sitting as in this case, in *Norton* v. *Shelby Co.*, (not reported,) that bonds issued by usurping corporate officials which were void could not, for want of compliance with the constitutional and statutory prerequisite of an election by the people, be ratified by the corporate action of the rightful officials after their restoration, a ruling which was supported by decisions of the supreme court before and since. *Marsh* v. *Fulton Co.* 10 Wall. 677; *Lewis* v. *Shreveport*, 108 U. S. 282; S. C. 2 Sup. Ct. Rep. 634; *Ottawa* v. *Cary*, Id. 110; S. C. 2 Sup. Ct. Rep. 361. It was said by the supreme court, in *Northern Nat. Bank* v. *Trustees Porter Tp.* 110 U. S. 608, S. C. 4 Sup. Ct. Rep. 254, speaking of an estoppel by recitals, that it did not go to the extent of precluding an inquiry into legislative authority to issue the bonds; and it certainly must be said of any contract of ratification, that, when pleaded as an estoppel *qua* contract, it cannot prevent an inquiry into legislative authority to issue the bonds. Does it receive any additional force when the contract of ratification has been made the basis of a judicial decree which in terms declares the bonds to be valid *only because the parties have agreed that they shall be valid?* It must be admitted that when in a court of competent jurisdiction, and without collusion or fraud, there has been a decree *in invitum* pronouncing, directly or by implication from the adjudication, that there was legislative authority to issue the bonds, that decree estops the parties from thereafter denying the authority. And we may go further and, for the argument, admit that if that decree be pronounced upon an agreed statement of facts, like that upon which we are now deciding this case, for example, the estoppel is equally as effective as if the facts were determined by the formal verdict of a jury or the judgment of a court upon the proof heard at the trial.

Judgments could not be so rendered at common law, where the admission must be strictly one of record, as by demurrer, default, confession, *retraxit*, or the like. Hence the necessity of such statutes as we have in Tennessee, permitting the parties to submit an agreed case to the decision of a court. Tenn. Code, §§ 3450, 3454, 4229, 4497. And, in the absence of a statute, such practice has been established by general usage. *Derby* v. *Jaques*, 1 Cliff. 425. From a judgment of this kind it was at first thought there could be no writ of error, but it was later decided otherwise. Id.; *Stimpson* v. *Railroad*, 10 How 329. Similarly, in a court of equity, it was always the rule that parties by themselves, or counsel, might agree upon a decree, and it was irreversible, and could not be appealed. 2 Daniell, Ch. Pr. (1st Ed.) 616–619, 668; Id. (5th Ed.) 973, 1453, and notes;

*Bradish* v. *Gee*, 1 Amb. 229; *French* v. *Shotwell*, 5 Johns. Ch. 555; *Ketchum* v. *Farmer's Trust Co.* 4 McLean, 2; *Musgrove* v. *Lusk*, 2 Tenn. Ch. 576; *Williams* v. *Neil*, 4 Heisk. 279; *Raysdale* v. *Gossett*, 2 Lea, 729; *Jones* v. *McKenna*, 4 Lea, 630.

But, obviously, it does not follow from this binding force of the decree that it can be always pleaded as *res adjudicata*. That depends upon other circumstances than its mere binding effect as a decree in the court where it is rendered. For example, a judgment of nonsuit, or a bill dismissed by plaintiff, or for want of jurisdiction, cannot be pleaded as *res adjudicata*, because not a decision on the merits, while a judgment on demurrer, which is a decision of the court on facts admitted, or a bill dismissed for want of equity, or upon determination of the court in favor of defendant, can be so pleaded. *Homer* v. *Brown*, 16 How. 354; *Manhattan L. Ins. Co.* v. *Broughton*, 109 U. S. 121; S. C. 3 Sup. Ct. Rep. 99; *Gould* v. *Evansville*, 91 U. S. 526; *Durant* v. *Essex Co.* 7 Wall. 107; *Badger* v. *Badger*, 1 Cliff. 237; *Mabry* v. *Churchwell*, 1 Lea, 416; *Bankhead* v. *Alloway*, 1 Tenn. Ch. 207.

So, in a case like the one we are now trying, again using it as an example, it is plain that the parties have used the agreed statement of facts as a convenient mode of placing the court in possession of the facts, without producing the evidence on which they would be otherwise ascertained; but they have left the decision of the rights of the parties growing out of those facts to the court, and have not by consent of parties determined, by themselves and for themselves, what those rights are. That which they have done is very like what they do when by a demurrer they admit the facts and the court decides the case, or when by a *retraxit* they confess the facts and the court directs a judgment. What they have not done is more like that which they do when they take a nonsuit or voluntarily dismiss their bill.

In the language of the case of the *Manhattan L. Ins. Co.* v. *Broughton*, 109 U. S. 125, S. C. 3 Sup. Ct. Rep. 99, "a trial upon which nothing was determined cannot support a plea of *res adjudicata* or have any weight as evidence at another trial" and, as decided in *Russell* v. *Place*, 94 U. S. 606, if it appear by the record or *aliunde* that the matter was not litigated and decided, there could be no estoppel. Now, does it not appear, by what the parties actually did in the state chancery court, that this matter was not litigated and not decided? And here lies a distinction that must not be overlooked in cases like this between a consent to submit a case to the court for its decision and a consent as to what the decision shall be. Again, there is a distinction between that estoppel which the parties put upon themselves by their *agreement* which may be pleaded and bind them as an estoppel *in pais*, and that which arises out of the adjudication as an estoppel of *record*. The agreement is none the less an estoppel because it takes the form of a judicial decree, but not necessarily does it operate as an estoppel of record. The pleas re-

spectively setting them up would be essentially different. 2 Daniell,
Ch. Pr. (1st Ed.) 175, 187; Id. (5th Ed.) 659, 666. In both, the
*record* would be used as *evidence;* in one case conclusive in its effect
to support the plea of *res adjudicata;* in the other it would not be
conclusive, might be averred against, and would be overcome by coun-
tervailing proof of sufficient force.

The text writers agree that in England a consent decree cannot be
pleaded as *res adjudicata,* and is effective when pleaded only so far as
the estoppel arises out of the agreement itself. Bigelow, Estop. 17;
Freem. Judgm. § 331; Whart. Ev. § 783. They say, however, that
the decisions of the American states, generally, are against this doc-
trine Id.; Wells, Res. Adj. §§ 440-460. We have examined very care-
fully a great many of the cases cited in support of this supposed dis-
tinction between the American and English courts, and find that if
critical attention is given to the distinctions to which we have already
adverted between a case decided by the court upon an admitted state
of facts, and one decided by the parties themselves solely by their own
consent, which the court admits of record by registering the agree-
ment, and between the estoppel of the agreement and that of the
judgment, and to distinctions arising out of local statutes regulating
the subject of judgments by confession and agreed cases, it may be
doubtful if there be so much divergence between those courts on this
subject.

To illustrate: In *Merritt* v. *Campbell,* 47 Cal. 543, a dismissal by
consent under the local statute was held equivalent to a judgment
upon *retraxit* at common law, and was a decision on the merits under
the act, because, like a *retraxit,* it was "an open and voluntary renun-
ciation of the suit in court." In *Ellis* v. *Mills,* 28 Tex. 584, it
does not appear whether it was the compromise agreement which was
a bar as a matter of evidence, or the judgment as a matter of record.
In *Fletcher* v. *Holmes,* 25 Ind. 458, there was an agreement for a
judgment not otherwise supported by the complaint, but it was not a
plea of *res adjudicata* at all. *Gates* v. *Preston,* 41 N. Y. 113, is more
in point, but there was a divided court. In *Bank* v. *Hopkins,* 2 Dana,
395, there was in effect a decision on an agreed statement of facts.
And, so we might go through the cases and distinguish them; but it
is not necessary, for we have not found one where a municipal cor-
poration has been held to have validated its bonds, otherwise void,
by a consent decreee declaring the bonds valid, and showing on its
face that it was so decreed solely because the parties had agreed to it.

Individuals *sui juris* may agree to almost anything and bind them-
selves, but corporations must act within their delegated powers. It
is undoubtedly within their power to compromise litigation, and they
may, when sued, consent to orders and decrees, and if the subject-
matter of the suit be within their authority this consent will bind as
it will individuals. As in *Board Liquidation* v. *Louisville & N. R.
Co.* 109 U. S. 221, S. C. 3 Sup. Ct. Rep. 144, it was held that the

city authorities had "under the statutes of the state" the power to compromise a suit relating to certain property belonging to the city, and in *Hillsborough* v. *Nichols*, 46 N. H. 379, the suit compromised was one for injuries by a defective highway which the authorities had a right to compromise, the subject-matter being within corporate jurisdiction. In this last suit, so much relied on here, and cited by the text writers above named, it is to be noted that there was no plea of *res adjudicata* at all, but it was an action by the town to recover money paid to the plaintiff under the compromise judgment. We cannot say that if the plaintiff in that suit had brought another action for the injuries, the former judgment by consent would have been held to sustain a plea of *res adjudicata*. These compromise judgments may be binding in other respects, but not necessarily for that reason pleadable as *res adjudicata*. Whether they are binding in other respects depends on the circumstances of the case; but whether they are binding on a plea of *res adjudicata* depends on whether the judgment or decree conforms to the rules of law which give it that effect. In *Lamb* v. *Gatlin*, 2 Dev. & B. Eq. 37, an exception to the report of a master equivalent to the plea of *res adjudicata* failed, because the former decree "was not in truth a decree rendered *in invitum*, and by judgment of the court to which defendant was compelled to submit, and which therefore not only binds him, but those for whose benefit he held the estate, unless it can be impeached for fraud, but it was a voluntary settlement, etc. A decree thus rendered has no force, except so far as seen to be just."

In *Allen* v. *Richardson*, 9 Rich. Eq. 53, it is said: "A consent decree is the mere agreement of the parties, under the sanction of the court, and is to be interpreted as an agreement." In *Rosse* v. *Rust*, 4 Johns. Ch. 300, where a bill had been dismissed on a former hearing because no one appeared for the plaintiff, the decree was pleaded as *res adjudicata*, and Chancellor KENT said that to be a bar the merits must be decided, and where the merits were never discussed and no opinion of the court ever expressed upon them, the case does not come within the rule. He was overruled in *Ogsbury* v. *La Farge*, 2 N. Y. 113, not upon the principle thus enunciated, but in his application of it, and it was held that a bill so dismissed after publication of proof was the same as a decision on the merits, and not like a voluntary dismissal or a nonsuit at law. But it must be admitted that in *French* v. *Shotwell*, 5 Johns. Ch. 555; S. C. 6 Johns. Ch. 235; S. C. 20 Johns. 668, that learned chancellor does decide that a decree by consent dismissing the bill may be pleaded in bar to another bill for the same relief, though, in that case, the agreement itself was likewise pleaded as an estoppel, and, without the decree, would have been just as effectual as with it; for, if the plaintiff had not dismissed the bill according to the agreement, the defendant, by proper pleading, even in that suit, might have called upon the court to dismiss it. In fact, the agreement settled the merits of the controversy, the par-

ties being competent to agree; and the plaintiff, having waived the
fraud and expunged the usury, there was nothing to do but dismiss
the bill, and all other bills setting up that fraud and usury.  All the
authorities agree that if the plaintiff had *voluntarily* dismissed his
bill he might have brought another suit.  He did voluntarily dismiss
it, but upon a valid agreement to do so; and from this it would seem
that it was the agreement, at last, that worked the estoppel.  But
the chancellor did not put his judgment on this ground, and the case
is a very strong one for the plaintiffs here, unless there be a distinc-
tion to be taken on the want of power in the corporate authorities of
Milan to make the agreement.  The case seems to have been affirmed;
but, it is said in *Shufelt* v. *Shufelt*, 9 Paige, 137, not on that point,
though the chancellor there followed it as to a confessed judgment.
The cases cited by Chancellor KENT are not all of them cases of pleas
of *res adjudicata,* those at page 565 being applications for relief on
*sci. fa.,* or direct applications to vacate the judgments, while *Loyd* v.
*Mensell,* 2 P. Wms. 73, and *Wishall* v. *Short,* 2 Eng. Cas. Abr. 177,
were original bills to impeach the judgments for fraud, and it was
held that the judgments might, in that kind of suit, be pleaded in de-
fense, if accompanied by an answer denying the fraud.  In *Baird* v.
*Berdwell,* 60 Miss. 164, the case establishes that where it is shown
by the decree that it was not heard upon its merits, there is no bar
to another suit.  It was a bill dismissed on motion of defendant for
want of prosecution after the case had been set down for final hear-
ing.  In *Pelton* v. *Mott,* 11 Vt. 148, there was an agreement to dis-
miss on the merits, which being done it was held to be a bar; and *Hicks*
v. *Aylsworth,* 13 R. I. 562, was a similar case.  The parties, by their
agreement in those cases, intended to provide against the distinction
between a voluntary dismissal, or a dismissal for want of prosecu-
tion, and an adjudication on the merits.  In *Rollins* v. *Henry,* 84 N.
C. 569, 578, the action of the court was more like that in this case
than any we have found, except that in that case the decree followed
the technical result of the agreement which settled the rights of the
parties and formally dismissed the bill, while in this the bill was
not technically dismissed, but was retained only so far as necessary
to enforce the final execution of the decree.  Substantially, the bill
was dismissed, as in the North Carolina case, in which it was held
that the decree could not be relied on as *res adjudicata* because "it
does not appear that the merits of the dismissed proceeding were con-
sidered and passed on; and the mere dismissal of the case is not, in
our opinion, followed by the consequences supposed."  The case
cited by the court calls attention to the fact that in equity courts to
"dismiss the bill" is the entry, whether the case is heard on the mer-
its and decided for defendants, or otherwise dismissed; while in
courts of law the form of the entry shows for itself whether it was
a mere discontinuance or a judgment on the merits.  *Jenkins* v.
*Johnson,* 4 Jones, Eq. 149.  Hence, in courts of equity, we must have

a care to find whether the decree was indeed an adjudication *in invitum* or only the agreement of the parties to act voluntarily.

In Massachusetts the rule seems to be that where issue is joined a decree by consent on that issue is a bar; but where no issue is joined, as where a plea in abatement has been sustained, after which there was a consent judgment, it is no bar. *Powers* v. *Chelsea Bank*, 129 Mass. 44; *Jordan* v. *Siefert*, 126 Mass. 25. Now, in the case we have in hand there was never any issue joined. After the demurrer was overruled the plaintiffs had a right to an answer from the defendants, and, failing in this, to a decree *pro confesso*, and ultimately a decree in their favor. Technically, overruling the demurrer was a decision in favor of the bill and an adjudication that the bonds were void; but by agreement of the parties this result was defeated by declaring the bonds valid, dissolving the injunction, and substantially dismissing the bill. There could be no decision on the merits, for there was no issue on the merits. The demurrer may have made an issue, but that was *overruled*, and this was a decision against the plaintiffs, and not in their favor. This is an anomaly in this class of cases, but it would be stretching the doctrine of this estoppel very far to allow the plaintiffs, in the face of an overruled demurrer, to have the benefit of a decree as if their demurrer had been *sustained* upon the issues made by it and thereby deciding the merits. *Gilman* v. *Rives*, 10 Pet. 298, 301; *Aurora* v. *West;* 7 Wall. 82, 99; *Gould* v. *Evansville Railroad*, 91 U. S. 526.

The best that can be said for the plaintiffs, after this demurrer was overruled, is that upon a naked bill, without any issues of any kind or any pleading by defendant, the parties *agreed* to dismiss it, (though the decree does not in fact dismiss it,) upon a stipulation that the facts and law were with the defendants. The declaration by the court that the bonds were valid adds no force to the *decree*, which should have been simply that the bill be dismissed, if the court so decided. All the authorities, as we have shown, agree that such a decree is not a bar unless it be a decision on the merits, and the inquiry is always to see whether it is such a dismissal or one otherwise procured. Here the bill was dismissed after a decision of the only issue in the case made by the demurrer, in favor of the plaintiff, that the bonds were void. Technically, then, it seems the decree cannot be a bar except upon the theory of a purely consent arrangement to dismiss a bill, before answer filed, by an adjudication without issues, shown upon the face of it to be not the judgment of the court, but the judgment of the parties as to their own rights.

In *Jenkins* v. *Robertson*, H. L. 1 Sc. 117, there was a suit by a town for a right of way for foot passengers. The town had a verdict, but afterwards abandoned it and agreed to a judgment absolving the defendants, and to pay the costs and expenses, and the court so declared. That was a case precisely like this, except that the subject-matter was clearly within the power of the municipality to arrange

Nevertheless, the house of lords held that a decree so procured by consent was not a bar to a new action by the town, and reversed a decree below to the contrary. It was announced in the most emphatic terms that the law of England and Scotland was that a decree so pronounced could not be *res adjudicata* except so far as an estoppel could grow out of the agreement. And in the *Earl of Bandon* v. *Becher*, 3 Clark & F. 479, 509, the same court approved the statement of the doctrine, as made by the solicitor general in the *Duchess of Kingston's Case*, 20 How. St. Tr. 478, that such decrees may be attacked when so pleaded for collusion or fraud, because there is no *real* prosecution, no *real* defense, and no *real* decision.

In a case like that we are considering, an agreement that would impose, without legislative authority, a tax upon the citizens of the municipality to pay bonds that were void, is itself a fraud, no matter how well intentioned, or how much the parties believed in their power to make it. After the agreement was made, it was a collusive suit and a collusive decree to all intents and purposes, and it is a mistake to suppose that there should have been a corrupt bargain, by which the persons acting for the town profited themselves to invoke this principle of fraud and collusion. Its effects are the same, and it was none the less fraudulent in contemplation of law because the parties got nothing for the wrong, or thought they were doing right. *Ensminger* v. *Powers*, 108 U. S. 292, 301; S. C. 2 Sup. Ct. Rep. 643. Objection is made that the decree of a *state* court pleaded as an estoppel cannot be attacked in this court for fraud in procuring it. *Christmas* v. *Russell*, 5 Wall. 290. But this does not apply when the infirmity appears in the record and on the face of the decree itself, as it does here. It is then a question of the character of the judgment itself, in its relation to the conduct of the parties procuring it. It is not attacking the judgment for fraud and collusion, but the presentation by the plaintiffs themselves of a record which recites the collusive arrangement, and makes it *felo de se* as between the parties to it. They had no power to issue bonds, assumed to supply it by contract between themselves, and sought to sanction that assumption by a judicial decree. They might as well without a suit have taken a judicial decree in the form of an act of the legislature, and in lieu of it. Indeed, such a decree is a usurpation of legislative power when it undertakes to declare by mere consent of parties the validity of the bonds. If the legislature had especially invested the courts with power to make such declarations, and thereby make valid bonds that were void by want of legislative authority, it would be unconstitutional as a delegation of legislative power. *Jones* v. *Perry*, 10 Yerg. 59; Cooley, Const. Lim. 87–114, 392.

The supreme court of the United States in *Gaines* v. *Relf*, 12 How. 472, 537, decides with emphasis that a collusive suit cannot be *res adjudicata*, because there is not a *real* controversy *really* litigated. That was, in principle, a case like this, only the agreement did not

appear on the face of the decree, as it does here. It was throughout a consent judgment, and we regard the case as quite applicable here. So is the case of *Gay* v. *Parpart*, 106 U. S. 679, S. C. 1 Sup. Ct. Rep. 456, where a decree, that was merely "the judicially recorded supposed agreement" of the parties, was not allowed to stand in the way of doing justice between them. And in *Ensminger* v. *Powers*, 108 U. S. 292, S. C. 2 Sup. Ct. Rep. 643,—a very remarkable case,—the court denied effect to a plea of *res adjudicata* on a bill of review, because the decree pleaded was not the "deliberate judgment of the court upon the facts in the record," and "the functions of the judge were abdicated," etc. It is a very instructive case.

The most that can be said is that the authorities are conflicting on the question whether purely consent decrees are *res adjudicata*. But, certainly, we should not be asked to give this decree greater effect than it would have in the state courts of Tennessee, where the supreme court, in the case of *Hix* v. *Gosling*, 1 Lea, 560, has, in terms, adopted the English doctrine. *Rice* v. *Alley*, 1 Sneed, 52; *Penniman* v. *Smith*, 5 Lea, 130.

We do not wish to be understood as ruling that a record is not to be taken for all that it implies when pleaded as *res adjudicata*, or that the trial of that plea will require an inquiry into the extent of the litigiousness of the parties, or the quality and quantity of consideration given to the case by the court rendering the decree, or whether its action was based on a formal or informal presentation of the facts and law, but only that the technical character of the judgment must be such that, necessarily, there was an adjudication of the merits by the court, invoked or sustained, it may be, by consent of parties, but none the less an *adjudication*, and not simply a judicial registration of an agreement of the parties. And while a consent decree upon agreement as to the facts and, possibly, as to the law of a case, may, under some circumstances and as to some parties, have all the force, and as effectually estop the parties as would a decree *in invitum*, it is not, in our opinion, competent for the authorities of a town to agree that its void bonds shall be made valid by putting that agreement into the form of a judicial decree, which, on the face of it, shows that it is not the judgment of the court upon the facts and law of a case actually litigated, but merely the record of an agreement of the parties that it shall have that effect; the authorities of the town assuming to act without legislative authority to ratify the bonds in that or any other manner.

It would be a dangerous rule if it were otherwise, and afford opportunities to impose fraudulent bonds upon communities with more facility than could be done under any device hitherto resorted to by those anxious to evade the restrictions of law on that power.

Judgment for defendant.

MATTHEWS, Justice, concurred fully in the reasoning and conclusion of the foregoing opinion.

[NOTE. The manuscript opinion of the supreme court of Tennessee, cited in the foregoing opinion, and printed in the briefs of counsel, is herewith appended, as it is not elsewhere accessible in print:]

### OPINION.

### *Mayor and Aldermen of Pulaski* vs. *Gilmore & Cherry O'Connor & Co.*
### (Nashville.)

In 1874 the directors and commissioners of the Memphis & Knoxville Railroad Company petitioned the board of mayor and aldermen of the town of Pulaska for a subscription of $40,000 to their capital stock, on such terms and limitations as the board might see proper. The question was submitted to a vote of the people and approved by the requisite majority. The proposition involved the idea of issuing bonds having twenty years to run, each of the denomination of $500, bearing eight per cent. interest; stock to be issued to the corporation equivalent in amount to the bonds thus proposed to be issued. As part of the proposition it was agreed that these bonds of $500 each were to be issued to pay for the expenses incident to a survey of the line of the road through Giles county. These bonds were issued and came into the hands of the parties plaintiffs in this case before due, and are the basis of the present suit.

We may assume, for the purposes of this opinion, that the proceedings, if not perfectly regular, have nothing in them that can fix any right to urge it against the present holders. They stand as innocent purchasers for value. The only defense that can be made available against the liability sought to be enforced, is a want of authority in the corporation to issue the bonds in question. This is a defense at all times available in such a case, unless it may be the doctrine of estoppel *in pais* may be an exception allowed in certain cases.

The question then is, did the corporation, under the constitution and laws of the state, have the power to issue these bonds? If so, plaintiff was entitled to his recovery on the coupons; if not, defendant should have had a verdict. It is the case of a subscription to the stock of a contemplated railroad. The fact that these particular bonds were to be applied to pay for a specific part of the work necessary in the construction of the road, cannot alter the character of the bond, nor aid in arriving at a solution of the question of power. Whether to be used for this, or any other purpose connected with the construction of the road, the case would be the same. The proposition submitted to the people, and the contract attempted to be made, was simply a subscription for $40,000 of stock in the corporation, which was expected to build the road, and the bonds of the corporation (these three included) were to be issued in paying for said stock. By our present constitution, which in this respect is the same as that of 1834, § 2, art. 29, the general assembly shall have power to authorize counties and incorporated towns in this state to impose taxes for county and corporation purposes, respectively, in such manner as shall be prescribed by law, and all property shall be taxed according to its value upon the principles established in regard to state taxation. By the constitution of 1870 there is added: "But the credit of no county, city or town, shall be given or loaned to or in aid of any person, company, association, or corporation, except upon an election to be first held by the qualified voters of such county, city, or town, and the assent of three-fourths of the votes cast at such election."

We need not examine, discuss, or decide the question whether the *addenda* gives any additional or different power to the legislature from that conferred in the first clause of the section quoted; that is, to levy taxes for county and corporation purposes, respectively. It suffices that it was decided many years since that a railroad was a county and corporation purpose, and taxes might

be levied under authority from the legislature, to be used in aid of such enterprises. It is not improper to say that while this is all now settled in our state as an original question, the writer of this opinion did not and does not now concur in its correctness. The question, however, is whether, under the statutes existent at this time these bonds were authorized, the power to issue them is given. We need not, as we have said, go into the question of the constitutional power to authorize them. We need scarcely say that in order to the issuance of such bonds there must be an express authority given the city or town, either by a general law of the land, or by a special law for this purpose. No such power can be implied or can be inferred from any of the ordinary powers of such corporations. "No argument," says Judge McKinney, in the case of *Cook* v. *Sumner Spinning & Manuf'g Co.* 1 Sneed, 714, "can be necessary to show that the authority to purchase stock in a manufacturing company, or to issue bonds for the payment thereof, cannot be derived simply from the power of taxation conferred in a charter." See, also, 9 Heisk. 534.

Taxation and payment of all liabilities directly from this means is the normal work of action by such bodies. Bonds on time are not incident to this, and can only be issued when authority is conferred by law. The old act of 1852, Code, § 1142, and other provisions of that article, is the basis in our general law for such action as may be taken by counties and corporations in subscribing for stock in railroads running to or contiguous to such towns. It is too clear for argument that no such authority is found in these sections. The act of January, 1871, intended to regulate elections, under the constitution, in first section, simply embodies the authority contained in the constitution as to counties and towns levying taxes for county and corporation purposes, prescribing in the subscriptions the conditions and regulations by which the power shall be executed. But there is nothing in this act that can possibly be construed on any fair principle of construction to authorize the issuance of these bonds in payment of a subscription of stock in a railroad company. What was intended by the reference to "execution of all necessary orders, bonds, and payments, in order to carry out" a loan or credit, we need not now determine. See section 2; Code, § 491*a*. It suffices that there is no authority in this act to issue such bonds as are the basis of this suit; the same having been issued without authority of law, are simply void, whether in the hands of innocent purchasers or others.

Reversed, etc.                    [Signed]                    Freeman, J.